IN RE ESTATE OF CARRIE M. RUEDY.

No. 48595.

(Reported in 66 N.W.2d 387)

1308

OCTOBER 19, 1954.

Emmett P. Delaney and John L. Delaney, both of Clinton, for appellant.

Eugene T. Burke and Walter W. Eggers, both of Clinton, for appellees.

THOMPSON, J.—Carrie M. Ruedy died a resident of Clinton County on October 22, 1953. On October 27, 1953, proponents-appellees filed for probate an instrument, executed June 26, 1953, which purported to be her last will and testament. To this her son, Ralph Wilson, filed objections, raising the issues of lack of proper execution, undue influence, and lack of mental capacity. The trial court having directed a verdict for the proponents and rendered its judgment admitting the will to probate, the contestant appealed. The only error assigned or argued in this court concerns the mental capacity of the testatrix, so that under familiar rules the questions of proper execution and undue influence are deemed abandoned and no further attention will be given to them.

The will challenged by contestant, after providing for payment of debts, makes specific bequests of $750 each to Lea Borchardt and Vernon Nelson; of $500 to a niece, Helen Moore Grigsby; and of $250 each to Annie Lee and C. K. Lee. Except as to Helen Moore Grigsby we are not told whether these beneficiaries were related to the testatrix. Neither are we told the amount of her property; but there is some evidence she had rental realty which was of substantial value, and we assume the specific bequests above detailed were not large enough in amount to reduce the estate seriously.

There is also a bequest of $1000 to Clem Wilson, the oldest son of testatrix. It is provided, however, that if he were deceased at the time of the death of testatrix the bequest should be paid to his children in equal shares; and if he left no children the bequest should revert back to and become a part of the remainder of the estate. The record shows that Clem Wilson had not been heard from for many years, since about the end of World War I.

The remainder and apparently the greater part of the estate is left in trust to the City National Bank of Clinton with directions to pay the net income to the contestant during his natural life. At his death the income is to be paid to his two

sons in equal shares until the youngest reaches the age of twenty-one, when the trust is to terminate and the principal is to be paid to the two grandsons. A previous will, revoked by the terms of the contested instrument, had left the remainder of the estate outright to the contestant.

I. For the contestant there is the usual procession of witnesses who tell of forgetfulnesses, eccentricities, unclean personal habits and delusions of the testatrix. Edward L. Nye, whose wife sold insurance for a woman's fraternal insurance company, testified that testatrix constantly forgot to pay her premiums, and he or his wife found it necessary to call her or go to her home for them. Her home was shabby and dirty; she sometimes was not coherent in her conversation; sometimes she would not answer questions. She would talk of her son Clem, who had disappeared about the time of World War I. Mrs. Nye attempted to get her to eliminate him as one of the beneficiaries in her insurance policy, also to have her change the designation of a deceased sister, but she did not make the suggested changes. Although this witness fixed no dates for the observations made, other than that in the last year and one-half of her life testatrix was confused "at most times", he expressed the opinion she was of unsound mind at the time of making her will. His wife's testimony was much the same, except that she added that Mrs. Ruedy said she had no money to send to her son, the contestant, who was ill, when in fact she had rents coming in regularly.

Effie Olson, Isabelle Perryman, the latter's husband, Arthur Perryman, and Blanche Brown, all neighbors or former tenants of testatrix in her apartments, were each of the opinion she was of unsound mind, or did not know what she was doing, or was unable to take care of her business. (It may be said in passing there is no evidence she did not care for her business almost until the date of her death.) In support of their conclusions as to testatrix's mental incapacity, these witnesses told of the dirt in her home; that she would save cartons, boxes, old newspapers, and other discarded objects, and her rooms were filled with them. They testified she was given to searching in garbage cans and retrieving partly spoiled food therefrom. She would then cut out the spoiled parts and use what she

could save. She accused Mrs. Perryman of trying to poison her to get her money. She said she held conversations with a deceased grandson, Maynard Wilson, a son of contestant, whom she had adopted and reared. She accused Mrs. Perryman of stealing $50, which was later found in testatrix's closet. She forgot payments made by her tenants, and accused them of delinquencies, and when they produced receipts she denied her handwriting. She,thought her properties were worth $12,000 to $15,000 apiece, according to the witness Brown, who testified they were in a bad state of repair and if inspected would have been condemned. When the Perrymans moved from her apartment she claimed a bed and a chair they had loaded on the truck as hers, and although the property was theirs they let her take it rather than have a quarrel.

The witnesses Olson and Brown testified also .to an apparent infatuation of the testatrix with one Johns. Mrs. Ruedy said she was going to marry him. He was a man about forty to forty-five years old, testatrix being much older. (Her age is given at one point in the record as seventy-eight, at another as sixty-eight.) She said Johns was going to buy her a nice car, and took Mrs. Olson down and showed her the car in a show window. Johns helped her collect rents. None of these witnesses gave accurate dates when their observations were made. Mrs. Brown saw her last on the day she drew the will in question, and says "in my opinion she was confused." But no definite dates are fixed for the incidents which she relates, and she does not give any detail supporting her conclusion Mrs. Ruedy was "confused" on June 26, 1953, the date of execution of the will.

Three doctors also were called by the contestant. Their testimony is chiefly illuminating for what they did not say. Dr. Bernard B. Dwyer, who was called on October 7, 1953, to treat testatrix in her last illness, said she was suffering from peritonitis due to a subacute appendix. .She had high blood pressure and arteriosclerosis, and a skin cancer. She died on October 27 of a cerebral hemorrhage. While he detailed the effects of arteriosclerosis and said testatrix had had it for some time, he declined to say for how long. He was apparently not asked as to Mrs. Ruedy's mental condition during the time he

treated her. Dr. Joseph E. O'Donnell had treated Mrs. Ruedy for carcinoma of the neck since April of 1953. He saw her in September in her home. She had a slight stroke. He sent her to the hospital, where he discovered she had arteriosclerosis. It is a progressive disease and has varying effects. "It may cause cerebral brain changes. In her case it was a stroke that might have affected a portion of her brain. As to whether she was sane on September 28, there is always a question of degree involved and you expect people of sixty-eight with strokes and so on and dimming of some of their functions and such people [are] certainly somewhat confused. I could interpret it more or less of the end of the picture of a person of elderly age who had arteriosclerosis, a stroke, etc. She was old in my opinion."

Dr. L. O. Riggert, after describing arteriosclerosis as a disease in which the elastic tissue in the arterial system is replaced by fibrous tissue, was asked a hypothetical question containing the facts brought out by contestant's other witnesses, and which concluded with: "State whether or not such a person was of sound or unsound mind. A. I could only suspect it. Q. The facts would indicate from your knowledge and experience that she would not be of sound mind? A. I couldn't make that statement, not having her own history, and a careful check of the woman and some other evidence but in this case from what you said, I would suspect she might not be of sound mind."

It will be observed Doctor Dwyer was apparently not asked for his opinion; Doctor O'Donnell went no further than to say "she was old in my opinion"; and Doctor Riggert, although pressed and asked a second and very leading question, would go no further than to say "I couldn't make that statement, * * * but * * * from what you said, I would suspect she might not be of sound mind." Doctors Dwyer and O'Donnell were testatrix's physicians at the time of her final illness, which occurred about four months after she made the will in question. Doctor O'Donnell had in fact seen her about two months before the making of the will. Yet Doctor Dwyer was not asked and Doctor O'Donnell when asked did not say whether she was of unsound mind. Under similar circumstances Justice Bliss, for the court, said in In re Estate of Ransom, 244 Iowa 343, 373, 374, 57 N.W.2d 89, 106:

"It is significant this doctor was not asked his opinion as to the mental soundness or unsoundness of the testator during the time he attended him or on January 27, 1950 [the date of the will], or the extent or progress of these diseases. It is a fair assumption that his answer would not have aided contestants and probably would have been adverse."

Nor can we find any aid for contestants in the testimony of Doctor Riggert, who declined under the pressure of a highly leading question to go further than to say he would "suspect" unsoundness of mind. The law requires something more definite than suspicion before the jury may be permitted to exercise its function. Its verdict cannot be allowed to rest upon speculation or conjecture only.

II. In considering the propriety of a ruling which sustains a motion for a peremptory verdict, in will contests as in other cases, we take the contestant's evidence in the most favorable light which may reasonably be given it. In re Estate of Eiker, 233 Iowa 315, 317, 6 N.W.2d 318, 320. It is possible the proponent's evidence may occasionally so thoroughly refute contestant's case that it is destroyed although it might have called for a jury submission if uncontradicted; but we shall assume the case at bar is not such a case, and that the determination turns upon whether a jury question was engendered by the showing made by the contestant. We shall therefore omit extended reference to proponent's evidence.

It must be kept in mind that the mental incapacity which is important here must refer to the exact time of making the will. It is true evidence of the condition of the mind of the testator at other times may be received if there is a reasonable basis for the conclusion it throws some light upon his mental competence at the time the will was made. In re Estate of Rogers, 242 Iowa 627, 631, 47 N.W.2d 818, 820. The record here shows a considerable lack of definiteness on the part of contestant's witnesses as to the dates of the matters they observed. True, they place some of them within "the past two years" or "the past year and one-half", and one witness said Mrs. Ruedy was confused on the day she made her will. She gives no facts as to the nature or evidence of the confusion.

1314

It will also be noted that contestant's evidence at the best concerns only unclean personal and housekeeping habits of the testatrix, forgetfulness, extreme thrift which led her to search garbage cans for salvageable food, and delusions. Do these matters, taken at their aspect most favorable to contestant, require a submission to a jury? The burden is upon the contestant to make an affirmative showing from which mental incapacity of the testatrix can be fairly deduced. It is also established that mental weakness due to disease does not deprive a testator of testamentary capacity until it has progressed to the point at which the power of intelligent comprehension and action has been destroyed. Bishop v. Scharf, 214 Iowa 644, 653, 241 N.W. 3, 7. Mere old age or some deterioration in mental powers, childishness, and eccentricities are not alone enough to carry the question to the jury. In re Estate of Shields, 198 Iowa 686, 691, 200 N.W. 219, 221. Nor are delusions or hallucinations sufficient unless it can be fairly determined from the evidence concerning them, together with such other proof as the contestant may make, that they show a mind affected to the point where it no longer had the comprehension required in the making of a will. In re Estate of Ransom, supra, page 381 of 244 Iowa, page 110 of 57 N.W.2d.

As the Ransom case points out, following many earlier cases, the question when the court is asked to direct a verdict for the proponent in a will contest is this: Has the contestant introduced sufficient competent evidence from which a jury might fairly find lack of testamentary capacity in at least one of these four respects: Understanding of the nature of the instrument; understanding of the nature and extent of the testator's property; knowing and remembering the natural objects of his bounty; and knowing the distribution he desires to make. In re Estate of Ransom, supra, page 378 of 244 Iowa, page 108 of 57 N.W.2d.

We find no substantial evidence that the testatrix here was lacking in comprehension in any one of the foregoing. There is no evidence whatever she did not know she was making a will; and the testimony of the attorney who drew it and others is clear that she did understand; did in fact call at the lawyer's

office and advise him she wanted to make a new will, and her reasons therefor.

The only evidence she did not understand the nature and extent of her property is found in the testimony concerning her failure to change the beneficiaries in the insurance policy and that she overvalued her real estate. At the most, the insurance policy matter shows only forgetfulness or indifference; and we can hardly set up a standard of mental competence which says the owner of property who places its value too high is lacking in mental capacity.

As to knowing the natural objects of her bounty and the disposition she wished to make, the will seems to speak for itself. In fact, the contestant is not in a strong position to urge this point. He receives the great part of the income from the estate; he was in his mother's mind as the chief beneficiary of her will. Her desire to care for him speaks plainly; his objection seems to be to the way she chose to do it. With the contestant confined to an institution for tubercular patients in Nebraska, it seems logical enough his mother might prefer to leave the property in trust for his benefit so long as he should live, with remainder to his sons. She apparently thought this disposition would in the long run be for the best interest of her son and grandsons. The will seems logical, the principal beneficiaries are her closest living relative and his sons, and we are unable to agree there is any substantial evidence of lack of comprehension of the nature of the instrument, the nature and extent of testatrix's property, or of the natural objects of her bounty and the disposition she wished to make.

The testimony of the doctors, experts who should have known and recognized Mrs. Ruedy's lack of mental capacity if it existed, greatly strengthens our conclusion that the trial court did not err in directing a verdict for the proponents. It was not essential to mental capacity to make a will that she be able to make contracts or to carry on business generally. Bishop v. Scharf, supra, page 653 of 214 Iowa, page 7 of 241 N.W. She did, however, so far as the record shows, take care of the renting and other business of her apartments. As to her belief that she could talk with her deceased grandson, we have

held in Otto v. Doty, 61 Iowa 23, 15 N.W. 578, and In re Will of Dunahugh, 130 Iowa 692, 107 N.W. 925, that a belief in spiritualism (the chief tenet of which is that communication may be had between the living and the dead) is not evidence of an unsound mind.

The contestant says in argument we should view the picture as a whole, citing In re Estate of Rogers, supra, and In re Estate of Ring, 237 Iowa 953, 22 N.W.2d 777. It is true that items of conduct not sufficient standing alone to show lack of mental capacity may with others add up to sufficient evidence to require a jury verdict. But the difficulty here is that the various items do not total the required amount. The testimony of the doctors, ordinarily a potent force for the contestants in this class of litigation if it definitely points to lack of mental capacity (see In re Estate of Van Dyke, 245 Iowa 942, 65 N.W. 2d 63), not only fails to aid here but in fact greatly weakens contestant's case.

The facts in the many will contests which have been before the courts are so varied that comparison is generally profitless. This court can do little more than decide each case as it is reached. It is difficult to lay down a hard and fast rule that may with assurance be followed in every instance. No two cases will have identical facts, and a variance in facts will often lead to a variance in results. We know, of course, that the law is slow to deny the right of any person to dispose of his property by will as he sees fit. In re Estate of Sinift, 233 Iowa 800, 810, 10 N.W.2d 550, 554; Perkins v. Perkins, 116 Iowa 253, 259, 260, 90 N.W. 55, 57. With this in mind, we must avoid sanctioning a rule which would make a jury question of mere eccentricities, failures of memory, offensive personal habits, or other oddities of temperament or deportment which are so often related in these cases and relied upon as evidence of a mind which has failed beyond its capacity to meet the four tests of knowledge and comprehension set out above. No two persons are exactly alike in conduct, reasoning power, and ability to evaluate fairly and wisely existing conditions. It has been truly remarked that all of us are "a little queer" at times or in regard to certain matters, nor is it difficult in most cases to find witnesses who will seize upon instances of departure

from what they consider normal conduct as a basis for a belief in unsoundness of mind. Their opinions, of course, have weight only to the extent they are supported by the facts they have observed and are able to relate. Such testimony must be carefully scanned. It is possible that vagaries of the mind may be so exaggerated and unusual conduct may reach such a degree of irrationality that the question of mental competence in this class of cases must be determined by the jury. But we are clear this is not one of those cases. The contestant failed to offer substantial evidence of lack of mental capacity on the part of the testatrix. The trial court was correct in its ruling.— Affirmed.

All JUSTICES concur.