ANNA KNIGGE, appellant, v. RAJAHNEEN LEE KNIGGE DENCKER et al., appellees (case at law) consolidated with one other case (in equity), same parties.

No. 48737.

(Reported in 72 N.W.2d 494)

OCTOBER 18, 1955.

Bradshaw & Crawford, of Fort Dodge, for appellant.

Arthur H. Johnson, of Fort Dodge, for appellees.

THOMPSON, J.— This appeal concerns two actions, in each of which the plaintiff and the defendants are identical. One action was in replevin in which the plaintiff claimed the right to possession of an abstract of title to certain real estate, a typewriter, and a United States Government bond in the sum of

$1000, payable to the plaintiff, Anna Knigge, or the defendant Rajahneen Lee Knigge Dencker. The other action asked that a deed to certain real estate in the City of Fort Dodge be set aside and canceled. Although the replevin suit was at law and the action to set aside the deed in equity, the causes were consolidated for trial. Apparently they were tried in equity. It is plaintiff's contention, with which we agree, that upon this appeal we should try the replevin issues de novo as well as those involved in the other suit. McCulloch Investment Co. v. Spencer, 246 Iowa 433, 436, 67 N.W.2d 924, 925, 926, and cases cited.

I. We shall consider first the action to set aside the deed. The realty involved is a residence property in Fort Dodge which was the homestead of plaintiff and her husband, W. C. Knigge. The defendant Rajahneen Lee Knigge Dencker is a granddaughter of the plaintiff and W. C. Knigge; the other defendant, Carl Dencker, being her husband. Since Rajahneen Lee Knigge Dencker is the principal defendant in that most of the evidence revolves around her relations and dealings with her grandparents, we shall hereinafter refer to her as the defendant. The Knigges were elderly people at the time of the happenings material herein, each being in the neighborhood of 75 years of age. They had five children—Marie, Cecelia, Louise, Carl, and Opal. The defendant is a daughter of Louise, and was born to her out of wedlock. The Knigges took her into their home when she was five weeks old, and from that time on cared for her, reared her and educated her until she was married to Carl Dencker on September 9, 1953. She was past nineteen years of age at the time.

The plaintiff and her husband were hard working and thrifty people, of German descent. The plaintiff was born in Iowa. Apparently she first learned to speak German, but she learned English and was able to speak, read, write and understand it. Her testimony as shown by the printed record gives no indication of any difficulty in this regard. Neither of the Knigges had more than a limited grade school education.

In 1953, W. C. Knigge was in failing health. He had suffered for several years from stomach ulcers and had had two operations to remedy prostate trouble. He held the legal title to the real estate in question at the time the deed in controversy was made, on June 1, 1953, plaintiff having only a contingent right

of dower. W. C. Knigge died in a Fort Dodge hospital on July 14, 1953, apparently from cancer of the stomach. What interest plaintiff now has in the property if the deed is void is not entirely clear, but the question is not raised and we give it no attention.

The record indicates that the defendant had lived in the Knigge home all her life, and in every respect occupied the position of a daughter. There is substantial evidence that at least the usual affection between parents and daughter existed here.

█ W. C. Knigge was taken to the hospital on May 20, 1953, and with the exception of one short visit to his home on Father's Day remained there until his death. The defendant was at the time engaged to marry Carl Dencker, but no date had been fixed for the wedding. She believed—she says she had been told—that she was to be given the homestead property upon the death of the Knigges. There is substantial testimony from Carl Knigge and Francis Mullen to the same effect. When Mr. Knigge's health was obviously failing, it was apparently brought to the attention of Mrs. Dencker, the mother of defendant's fiancé, that the defendant had been assured she would be given the homestead. This led to a call by Mrs. Dencker upon the plaintiff in which the matter was discussed. Mrs. Knigge herself says the defendant had on two or three occasions importuned her to execute a deed. This the defendant denies. But in any event, mere importunity that does not go to the extent of controlling the will of the grantor does not establish undue influence. Arndt v. Lapel, 214 Iowa 594, 605, 243 N.W. 605, 610.

It appears that the plaintiff agreed, under some protest, she says, to talk over the matter with Francis Mullen, a former practicing lawyer in Fort Dodge, who was suggested by Mrs. Dencker. Shortly thereafter Mullen called at plaintiff's home and went over the situation with her. There is some dispute concerning some of the details of the conversation, to which reference will be made later. The result was, however, that on June 1, 1953, Mullen called at the hospital where W. C. Knigge was confined. Mullen was accompanied by A. C. Braginton, an attorney practicing at Manson. The plaintiff was also present. At that time the deed in question was executed, conveying the residence prop-

erty occupied by the Knigges to the defendant and Carl Dencker, to whom she is now married. The deed reserved a life estate in the Knigges until the death of the survivor. Wills were also executed on this occasion by each of the Knigges. Each will gave all the property of the testator to the spouse, if he or she survived; and thereafter to the defendant.

II. It is somewhat difficult to determine the exact basis of plaintiff's allegations which she thinks entitle her to have the deed canceled. The petition seems to claim duress, deceit, misrepresentations amounting to actual fraud, undue influence and perhaps lack of mental capacity of W. C. Knigge at the time the instrument was signed. However, by motion for new trial after the trial court had handed down its judgment, plaintiff injected the claim of confidential or fiduciary relationship of the parties such as to throw the burden of proving the bona fides of the transaction upon the defendant. The defendant says this was an afterthought, and was never pleaded or urged upon the trial court until the motion for new trial. However that may be, we find no difficulty in disposing of the issue. The law which says the dominant party in a confidential relationship must bear the burden of proving that any transaction with the weaker one was in all respects fair and free from fraud is well settled in Iowa. Curtis v. Armagast, 158 Iowa 507, 138 N.W. 873; Merritt v. Easterly, 226 Iowa 514, 284 N.W. 397; In re Estate of Lundvall, 242 Iowa 430, 46 N.W.2d 535, and many other cases have determined this point.

But we agree with the trial court that there is no showing of a relation here between the plaintiff and defendant in which the defendant played the dominating part. The court said of the plaintiff: "She is a very strong-willed individual, almost contentious, and undoubtedly was the dominant personality in the household." The record fully supports this finding. The defendant had never handled business affairs for her grandparents or advised them concerning them. There is no showing whatever that she dominated them, or that they relied upon her in any way in financial or property matters. It is true the plaintiff pleads the defendant "struck and bruised the plaintiff on many occasions and threatened her with great bodily harm if she did not sign the instrument as prepared." There is an entire lack of

evidence to support these allegations, and the wanton and un-supported charge does considerable damage to the credibility of the plaintiff's testimony in other respects.

■ In Merritt v. Easterly, supra, page 519 of 226 Iowa, page 400 of 284 N.W., Justice Bliss, speaking for the court, quoted with approval from Utterback v. Hollingsworth, 208 Iowa 300, 302, 303, 225 N.W. 419, 421: " 'The relationship must be such as to enable the one charged with having abused it to have exercised it to his advantage. It must appear expressly or by implication that trust or confidence was reposed. The supposed trustee must be shown to have been in a position of advantage or superiority such as to imply a dominating influence over the cestui.' "

The plaintiff's own dominating characteristics are abundantly apparent throughout the record. She was the captain of her ship; she made her own decisions.

III. We turn then to the claim of active fraud. It is difficult to say in just what way the plaintiff claims she was deceived. She says she agreed to talk with Mr. Mullen after Mrs. Dencker had told her others might overcharge her. She had only a slight acquaintance with Mrs. Dencker. Of this conversation plaintiff says: "I said 'We have a will', and she said 'The will won't go. All you have to do is make a deed and deed it to Rajahneen and the thing would be settled.' So I thought that would all be done for, that would be all right and that is what we made." On cross-examination she testified: "I was there when he signed it (the deed), but I did nothing because they told me the deed was all I needed so that it would be all settled, so the Denckers wouldn't have to pay probating or inheritance taxes. I signed, and I let my husband sign the deed because I was told that before the will was signed the deed should be signed." It seems clear the plaintiff knew she was signing a deed; in fact, she and her husband had had previous experience when they deeded a residence property to the children of their son, Carl, in 1951.

■ There is some testimony as to the mental weakness of W. C. Knigge on the date the deed was signed. The plaintiff does not plead mental incapacity of W. C. Knigge, the holder of the legal title at the time of the conveyance. It is worthy of note that although he was under daily medical care at all times material here, no doctor was called to testify as to his mental condi-

tion. The burden was upon the plaintiff to plead and prove lack of mentality sufficient to permit the grantor to understand the nature of his act; and the same is true of her claim of undue influence. Merritt v. Easterly, supra. The defendant, and Mr. Mullen and Mr. Braginton, who were present at the time the deed was signed, all testify Mr. Knigge understood what he was doing. The hospital records introduced in evidence by the defendant, while showing that Mr. Knigge was seriously ill, make no mention of any mental deficiencies.

There is also the highly important point, with considerable supporting testimony, that the Knigges wished this young woman whom they had reared as a daughter to have the homestead when they were gone. The defendant testified without objection that since she was a small girl she had always understood from her grandfather that this house would be hers some day. She further says of the occasion when Mr. Mullen came to the house: "My grandmother and Mr. Mullen were discussing deeding over the home to me. She wanted to deed the home to me, and she wanted me to have the furniture also. Mr. Mullen told her that she should keep the furniture, that she might want it. She wanted to make it a bill of sale. And she wanted to sign some bonds over to me; but he told her she strictly should not do that." She further testified: "I first learned that the deed had actually been signed when my grandfather told me. It was probably the next day after he had signed it. I was standing by the bed. He took my hand and told me he had deeded the home over to me. He said it was something he had wanted to get done." The plaintiff handed the deed to the defendant when it was returned in the mail from the county recorder's office, about June 6th; and at or about that time she gave the defendant the abstract of title to the property, together with $2000 in cash, and a government bond in the face amount of $1000, payable to the plaintiff or the defendant. Carl Knigge, a son of plaintiff, testified that his father told him that he could have the home place if he wanted it, and he (Carl) said "absolutely not"; and he (W. C. Knigge) said "It goes to Pip" ("Pip" being a diminutive name for the defendant).

There is no strong contradiction of the contention that the grandparents had for a long time intended the defendant

should have the homestead upon their deaths. The plaintiff does say the will they had was sufficient; but all her actions and much of her testimony strengthen the thought they wanted the granddaughter to own the home when they were through with any need for it. Mrs. Knigge selected the deed because she was advised there would be less expense. The record indicates that a few months after the deed had been executed and delivered she changed her mind. She says many harsh things about the defendant. To the trial court they did not have the ring of truth, nor do they to us. Of course the court who saw the witnesses and observed their demeanor had a superior opportunity to judge the truthfulness and fairness of their testimony. When the question of credibility is involved we give weight to the findings of the trial court. Meier v. Johannsen, 242 Iowa 665, 673, 47 N.W.2d 793, 798; Hatheway v. Hanson, 230 Iowa 386, 396, 297 N.W. 824, 828. Plaintiff's own halfhearted denial that the deed carried out a long-established purpose of herself and her husband, in which she admits the defendant would have gotten the property if she had obeyed her grandfather's wishes (we are not told any specific ways in which she disobeyed), adds nothing to her case. And it appears that after talking with Mr. Mullen and before acting upon his advice she consulted with Mr. Frank Mohler, president of the Fort Dodge National Bank.

IV. The testimony of A. C. Braginton, the lawyer who drew the deed in controversy, and his law clerk, Francis Mullen, was offered and taken subject to objection that it called for confidential communications made at a time when Mr. Braginton was acting as counsel for the plaintiff. Mr. Braginton later appeared as counsel for defendant in these cases, but withdrew at the time of trial, apparently just before taking the witness stand. The plaintiff thinks that in addition to the offered testimony being objectionable under the statute barring confidential communications, the question of ethics is also important. We do not put the seal of approval upon the practice of appearing as attorney and witness in the same case, or of withdrawing as counsel in one breath and testifying in the next. The plaintiff also complains that Mr. Braginton, having represented the plaintiff in the matter out of which the litigation arose, should not have accepted

employment from the defendant. The controversy is regrettable; but we cannot, because counsel has or is accused of having disregarded ethical standards, discard his testimony entirely. See Sewell v. Lainson, 244 Iowa 555, 57 N.W.2d 556; Sexton v. Lauman, 244 Iowa 570, 57 N.W.2d 200, 37 A. L. R.2d 353; Storbeck v. Fridley, 240 Iowa 879, 887, 38 N.W.2d 163, 168.

The trial court in its ruling said it had ignored the testimony of Mr. Braginton and Mr. Mullen, although it was convinced Mr. Mullen represented the plaintiff faithfully in the transaction concerning the deed. We think the court might well have considered the testimony of these two witnesses, and that what they said strengthens the findings of the trial court, with which we agree. It is true our statute, section 622.10 of the Code, bars confidential communications between a lawyer and his client. But the right of the client to object may be waived; and a waiver arises when the client himself testifies to the communications. The rule is clearly expressed in Kelly v. Cummens, 143 Iowa 148, 151, 121 N.W. 540, 541, 20 Ann. Cas. 1283:

"It is enough to say that, according to all authorities, a client who goes upon the stand in an attempt to secure some advantage by reason of transactions between himself and his counsel waives his right to object to the attorney's being called by the other side to give his account of the matter. Any other rule would subject the lawyer to any kind of scurrilous and unjust attack, and convert the statute from being a mere shield into a weapon of offense."

See also Lewis v. Beh, 206 Iowa 281, 285, 218 N.W. 944, 945; Whitmore v. Herrick, 205 Iowa 621, 631, 218 N.W. 334, 339; and Steen v. First National Bank, 8 Cir., Mo., 298 F. 36, 41.

It is true an attorney who withdraws from a case only at the last minute before taking the stand as a witness may find his testimony somewhat suspect because of his obvious interest in the outcome. But he is not incompetent to testify. Storbeck v. Fridley, supra, at page 887 of 240 Iowa, page 168 of 38 N.W.2d. In the light of the doubt thrown upon their testimony by the fact that Mr. Braginton had represented the plaintiff and her husband in drawing the deed in question, had then appeared in this case for the defendant and had withdrawn just before

taking the witness stand, we have examined the evidence adduced from him and his clerk, Mr. Mullen. Even under these obvious handicaps, we find their testimony has some weight in confirming the defendant's version of the happenings which led up to the execution and delivery of the deed. Mr. Braginton says that he went over the situation fully at the hospital with Mr. Knigge, and the latter told him the deed was exactly the way he wanted it. He knew the extent of his property, and the witness explained to him about the effect of the reserved life estate. Mr. Mullen says that when he first talked to the plaintiff at her home she told him she and her husband wanted to adopt the defendant, and wanted to make a bill of sale of the house and furniture to her. He advised her an adoption would be of little aid at that time, and explained that a conveyance of the home should be by deed rather than bill of sale and counseled against a transfer of the furniture. She said her husband was worrying about the matter and she wanted to get it done so his mind would be relieved. When he went back the next evening she told him she had gone to the bank and talked with Mr. Mohler and he had confirmed what the witness had told her. At that time Mrs. Knigge produced the original deed to the home. The testimony of both of these witnesses, while subject to some impeachment for the reasons set out above, seems otherwise frank and confirms the defendant's own account of the transactions. This is particularly true in view of the uncertain and overheated testimony of the plaintiff, and her failure to deny many material statements of defendant and her witnesses. It is also to be noted, in connection with plaintiff's attempt to show that W. C. Knigge was mentally incompetent at the time of the making of the deed, that no doctor was called by her, although Mr. Knigge was under daily medical care at the time the deed was made. Her case at this point must be weighed according to the proof which she could have produced. Paulsen v. Paulsen, 243 Iowa 51, 60, 50 N.W.2d 567, 572; State v. Cotton, 240 Iowa 609, 625, 33 N.W.2d 880, 889; In re Estate of Ruedy, 245 Iowa 1307, 1312, 1313, 66 N.W.2d 387, 390; In re Estate of Ransom, 244 Iowa 343, 373, 374, 57 N.W.2d 89, 106. The mental state of both grantors in the deed was proper to be considered upon the question of undue influence. In re

Estate of Rogers, 242 Iowa 627, 635, 636, 47 N.W.2d 818, 823, and cases cited. But we think there is no substantial evidence to show that the plaintiff herself did not know the meaning of her act in signing the deed, and she has failed to show by the required quantum of proof that her husband was mentally incapable of realizing what he did.

V. The plaintiff urges that the disposition of the property by herself and her husband was unnatural and raises an inference tending to support the claim of undue influence. Here it is material to note that at the same time the deed in controversy was executed plaintiff and her husband each signed a will. Each will gave to the other spouse all property of the testator if such spouse survived him or her. Upon the death of the survivor all property was devised and bequeathed to the defendant. These wills were prepared and produced by Mr. Braginton, in accordance with what he and Mr. Mullen testified were instructions given them by plaintiff. Plaintiff says she had no knowledge of the wills until the meeting in the hospital on June 1, 1953, the time of their execution. The precise question of the validity of the wills is not before us; but the disposition of property made by them in so far as all of the assets of the Knigges would eventually come into the hands of the defendant if she survived them might be an unnatural one. The exact amount and value of property owned by plaintiff and her husband does not appear; but we are told there was a considerable quantity of United States bonds. On one occasion the plaintiff made over $18,000 of these to joint names of herself and her daughter Opal Greenfield, and small amounts to others. The conveyance of the homestead property alone to the defendant would not be an unnatural disposition. Giving her all property of plaintiff and her husband might be such, in view of the fact that they had five children. On the other hand, the defendant had been in their home and filled the place of a daughter to them for many years after their own children were gone. There was ill feeling between the plaintiff and her son, Carl, and she apparently had little regard for her daughter Louise, the mother of defendant. The circumstance of the wills tends somewhat to support the claim of undue influence, but is not in itself sufficient to prove plaintiff's case. The counter-

vailing testimony showing that plaintiff understood what she was doing in executing the deed, and that both she and her husband had for many years intended to protect the defendant by giving her the homestead property, is too strong to be so overcome.

It must be borne in mind that plaintiff is here attacking the validity of a deed. True, the conveyance was a gift, but it was a completed one. The burden was upon the plaintiff to establish the invalidity of the deed by clear, convincing and satisfactory evidence. This applies to the necessity of showing undue influence; it must appear by the designated quantum of proof that there was such persuasion as to overpower the will of the grantor and to destroy his free decision and substitute the decision of another person for his own. Leonard v. Leonard, 234 Iowa 421, 428, 12 N.W.2d 899, 902, 903.

VI. The proper determination of the issues in this case rests largely upon the facts. The legal propositions involved are not intricate or difficult. It has not been possible to go into all details of the evidence, but we have covered the important facts which appear, and have considered the propositions raised by the plaintiff so far as they have a semblance of merit. We conclude that there is no room for the application of the doctrine of confidential relationship; that plaintiff was herself the dominant personality in her household, and relied in no respect upon the advice or guidance of the defendant or anyone acting for her. We also conclude the plaintiff has failed to carry the burden of proof to set aside the deed in question because of undue influence, duress, deceit, misrepresentation, mental incapacity, active fraud, mutual mistake or any of the other grounds upon which counsel seem to rely in argument. The evidence seems to show that the plaintiff and her husband for many years wanted the defendant to have this property and took this way of carrying out their wishes. What caused the plaintiff to change her mind does not clearly appear; even after the making of the deed she handed over the abstract of title, and it was not until after the defendant's marriage in September that she gave any evidence of dissatisfaction. There is some evidence that the matter was highly displeasing to some of the plaintiff's children and that it was their protests that changed her attitude toward the defendant. There is nothing else to account for her sudden reversal

from love and affection to the abuse and vilification shown in her testimony. In any event, she has failed to show herself entitled to the relief asked as to the action to set aside the deed. The moving finger has written and passed on; and the fact she now regrets she did what she did is not sufficient to permit her to retract and repossess.

▮▮▮ VII. The solution of the replevin action is not difficult. Since we have refused to set aside the deed, it seems apparent the abstract should be left with the titleholder. It was freely given to her by the plaintiff. The typewriter was a gift from the Knigges to the defendant and had been in her possession and used by her for several years. That it was plaintiff's money, or her husband's, that purchased it is not important; the gift was completed and the defendant has not only the ownership but the right to possession. As to the United States bond, there is no dispute but that plaintiff voluntarily placed possession of it in the defendant. She rearranged her bond holdings the day after her husband's funeral. Probably she did this, with the exception of the $1000 bond involved in the replevin suit, only by making certain of her daughters, payees of the bonds with herself, retaining possession. We have pointed out that she put the name of her daughter Opal Greenfield on bonds of the face value of $18,000, and followed the same procedure with other daughters and other bonds in lesser amounts. She also placed the defendant's name as a payee with herself on a $500 bond; but she retained possession of this one, and has since cashed it. The defendant says that at the time her grandparents sold a farm they owned, in 1951, and invested the proceeds in bonds, they told her they were placing $1000 in her name; and this is the bond her grandmother gave her. That the plaintiff meant to part at least with possession is shown by the fact that she retained the $500 bond, likewise made out to herself and defendant, in her own safe-deposit box and has since cashed it. We conclude the trial court was correct in its judgment on the replevin suit also.—Affirmed as to both cases.

All JUSTICES concur.