HOBART M. THOMAS, administrator of estate of CARRIE LEVY, deceased, and JOSEPH WILLARD ROSENFIELD et al., appellants, v. SIDNEY STRAUSS et al., appellees.

No. 48740.

(Reported in 75 N.W.2d 268)

Camp & Harsh, of Creston, Seidner & Seidner, of Chicago, Illinois, and J. R. McManus, of Des Moines, for appellants.

J. D. Reynolds and E. L. Carroll, both of Creston, and R. E. Killmar, of Osceola, for appellees.

SMITH, J.—Carrie Levy, an elderly childless widow, died intestate September 2, 1952. Her husband had died in 1929. She left two sisters, defendant Flora Strauss, five years older than herself, and Amelia Wolf; and various more distant heirs, children of deceased brothers and sisters.

On or about April 26, 1939, Carrie Levy (then 70 years old) entered into a written contract with her sister Flora's children, defendants Sidney Strauss and Helen S. Dreyfuss, by the terms of which she agreed to transfer to them all her interest in real estate upon consideration of their agreement to pay her $175 monthly during her lifetime, "subject to and conditional on the overseeing, supervising, management and control of the said property, and the payment of the said income" by her said sister Flora, "during her (Flora's) lifetime." Flora however was not a party to the written contract.

The contract was drawn by Attorney E. L. Carroll of Creston and acknowledged before him as of May 2, 1939. As of this latter date decedent also executed a warranty deed to her said nephew and niece conveying grantor's interest in the seven described pieces of real estate owned by her and Flora in common. Both contract and deed were promptly recorded, May 4 and May 8, 1939, respectively.

The present suit is brought to set these instruments aside on account of alleged mental unsoundness of Carrie Levy and

alleged constructive fraud and alleged undue influence exercised upon her by defendants. Plaintiffs are the administrator and various heirs of her estate. The combined interest of plaintiff heirs in the estate is one half, of decedent's sister Flora, one sixth, and of other heirs (including Amelia Wolf) not parties to the suit, the remaining one third. The trial court entered decree against plaintiffs and they appeal.

Carrie Levy and Flora Strauss and their husbands were formerly associated in a mercantile business in Creston, Iowa. Flora's husband, Abraham ("Abe" or "A") Strauss, died in 1938 and the business terminated in 1940. Of the seven pieces of real estate described in the contract Mrs. Levy's interest was one half except in one it was described as forty per cent.

Other facts revealed by the 370-page record, so far as pertinent in the appeal, will be referred to as we discuss the issues involved.

■ I. We consider first the issue of decedent's mental condition at the time the instruments were executed. It is true, on that same day she signed a voluntary application for the appointment of her sister Flora as her guardian, and several days later the appointment was made. And on May 5, 1939, she entered St. Joseph's Hospital in Omaha, Nebraska. The application for an appointment of voluntary guardianship raised no presumption of mental incompetence. Olsson v. Pierson, 237 Iowa 1342, 1347, 25 N.W.2d 357.

Dr. John A. Liken of Creston, who made the hospital arrangements, testifies "she was having some delusions of persecution, and, as I remember it, she was self-accusatory * * *. * * * she felt she was in some manner guilty of having produced A. Strauss' death * * * that is what I meant when I said she was self-accusatory. She felt she was being persecuted but not by an individual."

Doctor Liken made arrangements by telephone with Dr. Ernest Kelley, head of the department of nervous and mental diseases at Creighton University in Omaha and chief of the service at St. Joseph's Hospital.

Doctor Liken had treated her previously, but not "for any mental condition." He testifies on direct examination that he

"didn't think she was able to do business within either two days or three days preceding my visit on May 5." He diagnosed her condition as "involutional melancholia * * * senile depression. I would think it would not come on suddenly." On cross-examination he explains that she was a diabetic and had some physical troubles, and concludes: "She had no delusions I know of pertaining to monies or properties."

Dr. Ernest Kelley was deceased when this suit was brought. His son, Dr. J. Whitney Kelley, also of Omaha, testifies he and his father were in partnership when Mrs. Levy was there, and expresses the opinion (from his own knowledge of Mrs. Levy's condition at that time *and from his father's record* of her case) that she was "mentally incompetent on May 6 (1939) both from the record and from my own memory." He himself kept no record of her case. We have no satisfactory way of appraising this opinion based, in part, on the unverified record of another.

Mrs. Levy was finally discharged from the hospital September 28, 1939. She later went to California. Defendant Sidney Strauss testifies he drove her and his mother out there "the latter part of June, 1940." Defendant Helen S. Dreyfuss had already gone in February or March of that year.

█ A doctor out there who knew her professionally from November 1949 testifies she was of sound mind "from the first day I saw her until approximately two months before her death." He treated her for physical ailments. That would be ten to thirteen years after the execution of the instruments in question.

Many witnesses testified who knew her in Creston—some for many years and up to the date of her removal to California. None questions her sanity. For instance, plaintiffs called Attorney D. W. Harper of Creston who doubtless knew her as well in a business way as anyone outside her family. He had been her attorney for a number of recent years. He sums up his conclusion concerning her mental attitude: "That (her expressed 'fear') was many times about her health and about her financial affairs. She had a fear of those things, which was a little more than the average old lady would have, but not too much."

Her nephew, Joseph F. Rosenfield (an heir but not a party to the suit) a prominent and respected lawyer and businessman of Des Moines, testifies he would see his aunt "a couple of times a year * * * maybe three times" from the time her husband died (1929) to 1940. Asked if she consulted him about legal matters he responded that while he never served her in a paid capacity "she would consult with me about legal or financial problems from time to time. Not too often but occasionally."

He referred especially to an occasion in March or April 1938, when he tried (unsuccessfully) to negotiate settlement of litigation then pending between her and Strausses (Flora and husband). He describes her as "normal" at all times: "I saw nothing unusual or extraordinary in any of her actions"; also, "I would say she had a good knowledge of the properties involved"; and "I think as far as I always observed, she was competent of handling her own financial affairs."

There is much more in the record bearing on decedent's mental condition. We recognize, of course, that a partial weakening might become important, if combined with a sufficient showing of undue influence and constructive fraud. But we consider the record shows sufficient to negative such possibility.

II. There is no evidence of any influence having been brought to bear upon decedent. There is no testimony any of defendants was even present when the instruments were signed.

E. L. Carroll, who drew the instruments in question, is an attorney for defendants but was plaintiffs' first witness. He frankly disclaims having been an attorney for Carrie Levy when the documents were drawn and signed but says: "I am not sure whether there was anybody present * * * other than myself and Carrie Levy * * *." Again he says "I acknowledged the signatures of the three * * *. I don't know that they signed it (the contract) at the same time. I think not."

He says, "I think I got those notes and descriptions from Mrs. Flora Strauss and Mrs. Levy"; also, "The guardianship petition was prepared at her (Mrs. Levy's) request. * * * Carrie Levy gave me the information (for its preparation) * * *. She arranged an appointment for me for the signing of" all three instruments.

It should be explained the signing was not done in the attorney's office, but in the Iowana Hotel at Creston where Mrs. Levy lived. Mr. Carroll says "I don't think she was ever up in my office." He explains: "She labored physically. She couldn't get upstairs or walk around very well—carried a cane."

On cross-examination (over objection) the attorney gives the only testimony as to her mental condition at the very time of the transaction: "I considered her capable and of sound mind and to know what she was doing and what she wanted."

The fact the attorney obtained information from both sisters concerning properties owned by them in common surely arouses no suspicion of undue influence.

It is also of some significance that the litigation (a partition suit) between them over these same properties, which had been pending for some years, was just terminated a couple of months before this transaction.

We repeat there is sufficient evidence no undue influence was used.

III. We now reach what may fairly be called plaintiffs' real reliance—the issue of constructive fraud growing out of alleged abuse of fiduciary, or at least confidential, relationship. The law recognizes there is a difference between "fiduciary" and "confidential" relations. But the two are often loosely used interchangeably by both lawyers and judges. Once the fact of relationship is established there is probably no important reason for the distinction.

The trial court met the situation here by finding that "for the purpose of this opinion * * * there was in fact a fiduciary and confidential relationship between" defendants and Carrie Levy. The context indicates a holding that decedent was the subservient party.

Following that finding the court then properly conceded the burden shifted to defendants to prove: defendants acted in good faith; that decedent had full knowledge of the facts "including the nature and effect of the transaction"; had opportunity to have, or had, full, independent and competent advice; and that there was no undue influence exercised. And after ana-

lyzing the situation the court further found defendants had carried that burden.

We agree with this latter conclusion and probably need not discuss the initial finding that either a confidential or a fiduciary relation between Mrs. Levy and defendants was in fact shown. The important thing is to remember that the mere existence of the relationship does not invalidate the transaction; its importance lies in the shifting of the burden of proof which it causes.

IV. We have already found the record sufficient to negative mental incompetence and undue influence. Assuming there was a confidential relationship we have next to consider whether the record discloses affirmatively that no advantage was taken of it by defendants.

It must be remembered the transaction sought to be set aside was a contract, not a gift. There was substantial consideration. And plaintiffs' own evidence establishes that while decedent and defendants had been associated closely in business, their relations were not all harmonious. Prior to his death (August 1938) Abraham Strauss managed the real estate owned in common by his wife and her sister.

While there is much in the record concerning the business situation at the time, the trial court also correctly took judicial notice of the depression and the period of inflation that eventually followed.

During the depression Mrs. Levy complained much to A. Strauss over the small returns being received from the properties under his management. The partition suit we have already mentioned doubtless was an expression of that dissatisfaction. It seems reasonable also that the transaction was the result of her worry over the general business situation and her desire to have a fixed net income in lieu of a precarious one, from the properties involved. She doubtless figured that would be preferable to the uncertainties of depending on the income from a considerable quantity of real estate under divided ownership. We think the record conclusively establishes she was fairly treated. She had no dependents. She retained her considerable in-

vestments in personalty. She was physically handicapped for looking after real estate.

As the trial court points out the record shows some of the properties had been sold for taxes, and on others the taxes were in arrears. Some of the properties were heavily mortgaged. The trial court also sagely observes, "Conditions might have changed a little for the worse and the grantees would have been losers."

We think the showing reveals that decedent was fairly treated. She was not hurried into the deal. The trial court correctly held she had the contract for several days before it was executed. Joseph Rosenfield testifies: "She had her own lawyer, I think, always that she employed and paid." She had ample opportunity to receive competent and adequate independent advice. We think these instruments cannot be set aside merely because of defendants' inability or failure to show whom she consulted or that she did actually seek advice.

Had she consulted Mr. Thomas L. Dougherty, who was or. had in the past been cashier of the bank where she transacted business and who later held a responsible Federal position for the Southern District of Iowa, he would doubtless have told her (as he told the court in this case) that under proper management her interest would not have netted her $175 per month under then existing conditions.

■ We recently said: "This court recognizes the importance of this factor [independent counsel] but has never held that in the absence thereof the presumption [of fraud] must prevail." Daniel v. Fackler, 244 Iowa 1163, 1168, 58 N.W.2d 309, 312.

V. We have refrained from bombarding the opinion with the wealth of decisions of our own court on the question of the burden of proof when confidential relation is shown.

■ In one of our most recent cases the rule is admirably stated: "The law which says the dominant party in a confidential relationship must bear the burden of proving that any transaction with the weaker one was in all respects fair and free from fraud is well settled in Iowa." Knigge v. Dencker, 246 Iowa 1387, 1392, 72 N.W.2d 494, 496, citing: Curtis v. Armagast, 158 Iowa 507, 138 N.W. 873; Merritt v. Easterly,

226 Iowa 514, 284 N.W. 397; In re Estate of Lundvall, 242 Iowa 430, 46 N.W.2d 535. An even more comprehensive list is found in the Merritt v. Easterly case, supra, 226 Iowa, at page 514.

In Jensen v. Phippen, 225 Iowa 302, 303, 280 N.W. 528, 529, we wisely admonished that the rule we are presently discussing "is, of necessity, applied according to the peculiar circumstances of the particular case where the question arises." It is a salutary rule, designed to safeguard the weak from even the unconscious selfishness of the strong. It is conceived in the highest traditions of chancery practice. It has not been violated here.

■ VI. It should be pointed out Mrs. Levy lived thirteen years after leaving the Omaha hospital and there is no suggestion she ever regretted the property arrangement she entered into in the spring of 1939.

Defendants have invoked the doctrine of ratification, the statute of limitations, and laches, but we need not discuss those issues. Nor, as said earlier, need we question the soundness of the trial court's concession that there was really a confidential relation shown by the record.

We are convinced Mrs. Levy knew what she was doing and was thereafter contented with the result. That she brought no suit to annul the arrangement for thirteen years is very significant, entirely apart from any issue of limitation or laches. The decision is affirmed.—Affirmed.

All JUSTICES concur.