JUANITA M., HEIDI and BYRON C. HART, minors, by BYRON L. HART, father and next friend, appellants, v. OLGA LUNDBY et al., and GEORGE R. GARTON, administrator with Will annexed of estate of Julius M. Moore, deceased, appellees.

No. 51721.

(Reported in 137 N.W.2d 642)

OCTOBER 19, 1965.

Brunk, Janss, Dreher, Wilson & Adams, of Des Moines, for appellants.

Virgil E. Meyer, of Chariton, for appellee Wilma Foster.

Killmar, Reynoldson & Harvey, of Osceola, for appellees Olga Lundby, Julius Eric Lundby, a minor.

SNELL, J.—This is an action at law to set aside the probate of a will. Plaintiffs alleged lack of testamentary capacity and undue influence.

Julius M. Moore, a widower, age 74, died May 3, 1960.

An instrument designated Last Will and Testament of Julius M. Moore was filed for probate in Lucas County.

Objections to probate were filed, subsequently withdrawn without prejudice and decedent's will was admitted to probate on September 20, 1960.

On May 5, 1962, this action praying that probate of the will be set aside was filed. The case proceeded to trial in February 1963. Following the introduction of plaintiffs' testimony the trial court sustained defendants' motion for a directed verdict, dismissed plaintiffs' petition and confirmed the instrument as the Last Will and Testament of the decedent. Plaintiffs have appealed.

There is no question before us as to the due execution of the will. The questions presented are the propriety of the trial court's direction of the verdict against plaintiffs, the judgment thereon, and the correctness of rulings on admission of evidence.

Decedent was born in December 1885. He was an orphan and spent his early years in an orphan's home. He had never been adopted and his true name was Thompson, but for many years he had used the name Moore. Why he used the name Moore rather than Thompson does not appear. His brothers and sisters used the name Thompson.

Mr. Moore had been an operator and later a depot agent, first at Beech and later in Chariton, Iowa, until he retired in 1950 at the age of 65.

Plaintiffs offered testimony that decedent's right kidney was removed in 1918 or 1920. An objection to this testimony was properly sustained, as necessarily based on hearsay, calling for an opinion and conclusion and as too remote in point of time. It appeared that the witness offering this testimony would have been between two and four years old at the time of such surgery. There was absolutely nothing in the record to connect surgery in 1920 with the decedent's testamentary capacity in 1958.

Questions propounded to the same witness as to decedent's surgery in the middle 1930s were objected to. The objections were properly sustained as too remote.

In 1935 decedent had surgery for a duodenal ulcer.

In 1944 decedent had a skin cancer removed from his right leg which following X-ray therapy required skin grafting.

All of this testimony was excluded as too remote. At no place in the record do we find any testimony whatsoever connecting these previous physical disabilities with the decedent's testamentary capacity in 1958. The evidence was properly excluded.

Testimony offered by plaintiffs as to decedent's stomach ulcer in 1954 was also properly excluded for the same reason.

Decedent's attending physician in Chariton was Dr. Albert Yocum. Doctor Yocum had attended decedent for a number of years. The doctor testified as to the hospitalization of decedent from January 15, 1958, to January 27, 1958. Decedent was suffering from gastric hemorrhages. At that time decedent was

disoriented and in delirium for three or four days and while in delirium was restrained with a sheet. The doctor testified that the delirium was caused by lack of blood. Decedent improved and was released.

Dr. Samuel Zoeckler, a specialist in internal medicine in Des Moines, cared for the decedent in Iowa Methodist Hospital in March 1960. The doctor's examination, objective and subjective, and tests confirmed a diagnosis of arteriosclerotic heart disease and chronic duodenal ulcer. Decedent improved and was discharged March 19, 1960.

Decedent was again attended by Doctor Zoeckler and re-admitted to the hospital on April 25, 1960, and died on May 3, 1960. Cause of death was uremia secondary to prostatic gland disease and the arteriosclerotic heart disease.

The doctor testified that there was a distinction between cerebral arteriosclerosis and arteriosclerotic heart disease and that there was nothing in the doctor's record to show cerebral arteriosclerosis. The doctor also testified that as far as he was able to tell decedent was well oriented at the time.

It is significant that no doctor who had ever attended decedent up to the time of his death testified to anything to show mental incapacity, except for the few days in January 1958 when, because of his illness, decedent was in delirium.

The hospital records compiled coincident with the decedent's first hospitalization in Iowa Methodist Hospital in March 1960 have an entry under the heading "Pertinent Family History" that the patient was an orphan and knew nothing about his parental background. Plaintiffs argue that this is of some significance. We do not agree. It appears without question that the decedent was an orphan and there is nothing in the record to indicate that he ever did know anything about his parental background. The lack of such information has no probative value whatsoever as to his testamentary capacity.

- It would appear that in some ways decedent was not a kindly man. His wife had been mentally deteriorating for many years and there was testimony that decedent had been inconsiderate and unkind in his treatment of his wife. However, there was no evidence of any sudden change in this particular. His

wife died before decedent's will was executed and there is no evidence that his former treatment of his deceased wife was in anyway related to decedent's testamentary capacity when he made his will.

Decedent's wife died at home while decedent was hospitalized in January 1958 and decedent was too ill to attend her funeral.

In August 1955 because of Mrs. Moore's condition Mrs. Wilma Foster was employed by decedent as a housekeeper and to care for Mrs. Moore. Mrs. Foster remained as housekeeper until after decedent's death in 1960. There was testimony by plaintiffs, corroborated somewhat by a neighbor, that the care afforded Mrs. Moore was not good. However, it is significant that not a single neighbor, associate or acquaintance offered a word of testimony or opinion indicating that decedent was lacking in testamentary capacity or in a single one of the elements necessary for testamentary capacity.

Decedent survived his brothers and sisters. In 1954 by testamentary devise and bequest decedent inherited over $60,000 from a deceased sister. Decedent had two daughters, plaintiff, Mrs. Juanita M. Hart and Mrs. Olga Lundby, one of the defendants. From the proceeds of the sister's estate decedent bought United States Series E Bonds for Mrs. Lundby and her two children at a cost of $22,500. He also bought bonds costing $7500 for the two children of Mrs. Hart. The gifts so made did not represent a per stirpes or per capita distribution by way of gift nor did they constitute equivalence between the two daughters and their children.

As noted, supra, decedent was hospitalized for about ten days in January 1958.

Sometime between the date of his discharge and April 2, 1958, decedent composed and typed on his own typewriter his "Last Will and Testament." On April 2 he took this instrument to the office of his attorney and there executed it in the presence of two witnesses, one of whom was his attorney.

Except for a few typing irregularities detracting from the skill of the typist the will is in good form and stated in clear

and unambiguous language. It followed the format of a short well drawn will.

Part I directed the payment of decedent's debts and funeral expenses.

Part II bequeathed to "my name sake, Julius Eric Lundby my watches and diamond ring."

Part III bequeathed to his grandson Byron C. Hart his automobile.

Part IV provided: "I give and bequeath to my loyal and faithfull (sic) house-keeper Mrs. Wilma Foster—, if in my employment and caring for me at time of my death—Ten Thousand Dollars ($10,000.00) for the kind consideration and care she has given to both my wife and my-self during my lifetime."

Part V gave the remainder to his two daughters share and share alike.

Part VI appointed his daughters co-executors without bond.

Plaintiffs point to two items as indicating lack of testamentary capacity and undue influence.

█ Byron C. Hart to whom decedent bequeathed his automobile was ten years old when the will was drawn.

While this beneficiary was still too young when decedent died to legally operate an automobile the bequest was not an idle gesture. The probate files show that the car was sold for $325. This more than equaled the value of the watches and diamond ring bequeathed to his other grandson. The files show these items were appraised at $230.

We are not prepared to hold that a gift by a grandfather of something beyond the present capacity of a grandchild to use is evidence of mental incapacity or lack of testamentary capacity.

█ Plaintiffs are unhappy because of the bequest to decedent's housekeeper and challenge the statement in the will as to "kind consideration and care she has given to both my wife and my-self during my lifetime." This bequest was conditioned on continued employment and service apparently thought needed by decedent. There was evidence that decedent had always been inconsiderate of and unkind to his wife. He might have been satisfied with less than good care of her in the past but his wife was dead when the will was executed and decedent was speaking for himself.

We do not have before us a quantum meruit claim for services. Whether the housekeeper's services were worth $10,000 beyond her regular wages is not the issue here. Even if decedent was overly appreciative according to our standards a lack of testamentary capacity is not shown thereby.

Plaintiffs offered testimony that when decedent's will was read Mrs. Lundby, a daughter, and one of the defendants here, "was quite perturbed to see that Wilma got the ten thousand dollars, and she said, 'to think that I could have broken this up.'" The testimony was not received. It was merely an expression of an opinion, in no way based on facts, as to what the speaker could have done. At the most it merely negatived any inference of influence by the daughter. There was no error in the court's ruling.

■ The lack of equivalence in the bond purchases and gifts in 1954 is no evidence that decedent did not know what he was doing or was acting other than of his own free will when he made his will in 1958.

■ To summarize plaintiffs' evidence received and including that offered but not received, decedent was an orphan using the name "Moore" rather than the name "Thompson" used by his brothers and sisters.

He typed his will on his own typewriter and took it to his attorney's office for execution. He was 72 years old at the time. He died in 1960 when 74.

In 1918 or 1920 he had kidney surgery, stomach ulcer surgery in 1935 and skin cancer surgery in 1944.

In January 1958 he was hospitalized for about ten days because of a bleeding stomach ulcer and for three or four days was in delirium because of loss of blood. His wife died during this time. His will drawn a little more than two months later gave his automobile to a grandson too young to drive and $10,000 to a housekeeper who plaintiffs say did not deserve such a bequest.

Decedent for many years had been inconsiderate and unkind to his predeceased wife.

There was lack of equivalence in the gift of bonds in 1954.

Two doctors testified for plaintiffs and hospital records were introduced but there was no expert testimony or supporting rec-

ords indicating mental incompetence or lack of testamentary capacity in April 1958 or such mental weakness as to make decedent unduly susceptible to undue influence.

There was no evidence of undue influence and nothing in support of such an allegation except the fact that decedent prepared his own will on his own typewriter that he kept at home and that his housekeeper was living in the same house at the time. Except for opportunity based on living in the same house there is not a scintilla of evidence to support a claim of undue influence. The failure of neighbors and associates to testify to anything of probative value is also significant.

Plaintiffs lacked evidence and lack of evidence is fatal in a will contest.

The basic principles of law involved herein are well settled. In re Estate of Springer, 252 Iowa 1220, 1224, 1225, 110 N.W.2d 380. In that case we quoted from In re Estate of Rogers, 242 Iowa 627, 47 N.W.2d 818, as follows:

" 'Where this issue is involved the burden is upon the contestants to show lack of mental capacity of the testatrix in one of these respects: (1) To understand the nature of the instrument he is executing (2) to know and understand the nature and extent of his property (3) to remember the natural objects of his bounty, and (4) to know the distribution he desires to make. If his mental capacity is not equal to any one of these tests he cannot make a valid will. [Citations] Conversely, the law is slow to deny the right of any person to dispose of his property by will as he sees fit. No mere impairment of his mental or physical powers, so long as he retains mind and comprehension sufficient to meet the tests above set forth, will render his will invalid. [Citations]. And we have often said that there must be substantial evidence of mental unsoundness in order to generate a jury question. [Citations]

" 'Also, the proof of mental deficiency must be applicable to the very time of the making of the will. [Citations] This is the question which must be determined, but in considering it, evidence of the condition of the testator's mind at other times, of his acts, expressions, appearance or statements may be received and submitted if there is a reasonable basis for the con-

clusion that they throw light upon the condition of his mind at the time of making the will. It is not essential that there be evidence of the exact date of execution of the instrument if there be something in the record from which it can be reasonably inferred what the state of his comprehension was when he made the will. [Citations]' "

■ Proof of incapacity in any of the required respects is sufficient. In re Estate of Springer, supra, loc. cit. 1226.

The right to make a will is not limited to those who are kind, considerate or, in the opinion of others, just. Ordinarily, the reason prompting the making of a will is a desire to provide for the devolution of property other than is provided by law. Section 633.1, 1962 Code of Iowa, revised and now appearing as section 264, chapter 326, Laws of the Sixtieth General Assembly, being a part of the Iowa Probate Code, provides that "subject to the rights of the surviving spouse * * * any person of full age and sound mind may dispose by will of all his property, except sufficient to pay the debts and charges against his estate."

■ We have repeatedly held that the law is slow to deny the right of anyone to dispose of his property by will as he sees fit. A declaration of the testator as to intent made two years before the execution of a will is entitled to little, if any, weight. A testator has a perfect right to change his mind. Drosos v. Drosos, 251 Iowa 777, 786, 103 N.W.2d 167.

In the case before us there was some evidence that in 1954 the decedent had intended to make equal gifts to his daughters and their families. The expression of such an intent in 1954 is insufficient to generate a jury question of testamentary capacity in 1958.

■ Failure to call witnesses, expert or nonexpert, or failure to ask questions of witnesses who are closely and intimately acquainted with testator as to the question of mental incapacity militates against a contestant. In re Estate of Burrell, 251 Iowa 185, 196, 100 N.W.2d 177, and citations.

Evidence of mental incapacity must refer to the exact time of making the will, but evidence of the condition of the mind of the testator at other times may be received if there is a reasonable basis for the conclusion that it throws some light upon his

56

mental competence at the time his will was made. In re Estate of Ruedy, 245 Iowa 1307, 1313, 66 N.W. 2d 387.

In the case at bar there is no evidence even remotely connected with the testator's mental capacity at the time the will was executed. Neither was there any evidence of a previous mental deterioration that would continue. Items of conduct not sufficient standing alone to show lack of mental capacity may with others add up to sufficient evidence to require a jury verdict, but in the case at bar the various items relied on by plaintiffs do not total the required amount. In re Estate of Ruedy, supra, loc. cit. 1316.

"In a will contest case the evidence must disclose more than a scintilla of evidence to justify the trial court in submitting the case to the jury." In re Estate of Burrell, supra, loc. cit. 197.

Testimony of witnesses as to departure from what they consider normal conduct and their expression of opinion of incapacity has weight only to the extent they are supported by the facts they have observed and are able to relate. Such testimony must be carefully scanned. In re Estate of Ruedy, supra, loc. cit. 1317.

For a discussion of infirmities and peculiarities not sufficient to generate a jury question on testamentary capacity see In re Estate of Sinift, 233 Iowa 800, 10 N.W.2d 550.

Undue influence is not established by proof of opportunity and disposition to exercise it. Importunity, request and persuasion that do not control the will are not enough. Drosos v. Drosos, supra, loc. cit. 788.

The trial court was right.

The case is—Affirmed.

All JUSTICES concur.