# IN THE COURT OF APPEALS OF IOWA

No. 15-0877
Filed December 21, 2016

**ROGER HALVORSON and CONSTANCE HALVORSON,**
    Plaintiffs/Counter-Claim Defendants-Appellees,

**vs.**

**ALLEN BENTLEY and DIXIE BENTLEY,**
    Defendants/Counter-Claim Plaintiffs/Cross-Claim Plaintiffs-Appellees/
    Cross-Appellants,

and

**KERNDT BROTHERS SAVINGS BANK,**
    Defendant/Cross-Claim Defendant-Appellant/Cross-Appellee.
_____

        Appeal from the Iowa District Court for Clayton County, Andrea J. Dryer,

Judge.


        Seller Kerndt Brothers Savings Bank appeals and land purchasers Allen

and Dixie Bentley cross-appeal the order of the district court finding that the Bank

breached its warranty under its deed to the Bentleys because it represented the

easement on the adjoining land it sold to Roger and Constance Halvorson

permitted parking when the language of its contract with the Halvorsons only

expressly mentioned "access."  **JUDGMENT VACATED IN PART, AFFIRMED**

**IN PART, AND REMANDED WITH DIRECTIONS.**

Dennis G. Larson of Larson Law Office, Decorah, and James A. Garrett of James A. Garrett Law Office, Waukon, for appellant/cross-appellee Kerndt Brothers Savings Bank.

J.K. Robison and Anne E.H. Kruse of Allen, Vernon & Hoskins, P.L.C., Marion and McGregor, for appellees/cross-appellants Bentley.

Alan T. Heavens of McClean & Heavens Law Offices, Elkader, for appellees Halvorson.

Heard by Danilson, C.J., and Doyle and McDonald, JJ.

**DOYLE, Judge.**

The dispute in this case concerns an easement on land Kerndt Brothers Savings Bank (Bank) sold to Roger and Constance Halvorson. The easement was granted for the benefit of the adjoining lot of land, which the Bank sold to Allen and Dixie Bentley. The central issue is whether or not the easement grants the Bentleys parking privileges. Following trial on the Halvorsons' petition for declaratory judgment, along with the Bentleys' cross-claims against the Bank, the district court concluded the easement only granted the Bentleys "access" to their land—meaning ingress and egress only, not parking. Because the warranty deed the Bank delivered to the Bentleys does not limit the easement to access only, the court found the Bentleys were entitled to the consideration they paid to the Bank for the easement they thought they were getting—one that allowed parking, and awarded the Bentleys $7500 in compensatory damages. The court also awarded the Bentleys their attorney fees for defending the Halvorsons' action. The court then entered a judgment against the Bank in favor of the Bentleys for $21,757.28.

The Bank now appeals the district court's ruling in favor of the Bentleys, arguing both the Bentleys and the Halvorsons received the easement they bargained for with the Bank and, therefore, it did not breach any warranty deed. The Bentleys cross-appeal, challenging the court's determination the easement was for ingress and egress only.

### I. Background Facts.

The facts of the case are essentially undisputed. In 2009, after its mortgagee defaulted on a loan, the Bank acquired title to the real estate that

secured the mortgage loan. The property consisted of several lots in the picturesque river town of Marquette. A two-level duplex was located on one of the lots. A house that was in "very bad shape" was located on an adjoining lot to the west. The two buildings were situated on a steep hill on the south side of the west end of North Street. The house and the duplex were separated by a path that was used as a driveway (Driveway), shown in the aerial photo below.[1] The Driveway inclines from North Street at a grade of approximately ten to fifteen percent and flattens out near its southern terminus.



In making the duplex conversion, the mortgagee "cut the roof off and raised it up so [he] could have an upstairs." He then "added on to make it a

---

[1] Though there was some disagreement at oral argument as to whether the path had been used as a driveway prior to this dispute, it does not appear that information was challenged at trial beyond the Bank's statute-of-frauds and parol-evidence-rule objections, which we address later in this opinion. We note that the Halvorsons' purchase offer, which was accepted by the Bank, expressly referred to the path as "the existing driveway" when describing where the easement would be placed. Moreover, several witnesses testified at trial that the path had been used as a driveway, including James Garrett, the Bank's attorney who prepared its title opinion; James Kerndt, the Bank's representative; and Roger Halvorson.

duplex," and he "took the [interior] stairs out of the house." Without interior stairs, there was no access between units inside the duplex. To provide access to the upper unit, the mortgagee installed an exterior door on the south side of the unit and built a walkway from that exterior door to the southern terminus of the Driveway. Because of the incline and the topography, the walkway was built in a southwest direction where it eventually met the Driveway at an acute angle. The mortgagee lived in the upper-level unit of the duplex and parked his vehicle at the end of the Driveway near the walkway. The mortgagee made the lower level of the duplex into a rental unit. Another driveway, which could hold two or three vehicles, existed on the north side of the lower level of the duplex. Parking in front of the duplex on North Street would obstruct the driveway to the house.

After the Bank acquired the property, it decided to sell the property in separate lots, with the house and duplex each in its own separate lot. To that end, the Bank hired Roger Mohn, a civil engineer and professional land surveyor, to identify the exterior lot lines of the property so it could divide the property into lots accordingly.

Based upon the boundaries of the existing lots, which can be seen in the aerial photo above, the Driveway and most of the walkway fell within the house lot—not the duplex lot. The Bank determined an easement would be established on the house lot to allow the future owners of the duplex lot to reach the entrance of the duplex's upper-level unit. Based upon the topography of the house lot, the existing Driveway path and walkway were used for determining the placement of the easement. After the surveyor informed the Bank's representative James

Kerndt that easements were normally between ten to twelve feet wide, it was decided the easement would be twelve feet wide.

On February 2, 2010, the plat of the lots prepared by the surveyor was recorded—without the easement shown or described therein. Though the surveyor provided to the Bank a metes and bounds description of the centerline of the proposed easement, the Bank did not have that description recorded with the plat. The proposed easement's written description stated, in relevant part: "A twelve (12) [sic] wide easement located in Lot Ten (10) of Block Five (5) and in vacated Third Street . . . ." The description went on to set forth the metes and bounds of the centerline of the easement. The proposed easement did not include the terms "access," "ingress," "egress," or "parking"; in fact, no purpose for the easement was given in the written description.

Roger Halvorson contacted Kerndt at the Bank about buying some of the lots on the property. The Halvorsons live three blocks from the property, and they operate a winery on North Street near the property. Roger wanted to preserve the hillside where the house was located and "had strong feelings about preventing anyone from developing that hillside." Roger was advised that if he did not purchase both the house lot and the duplex lot, an easement across the house lot would be necessary to allow the future owners of the duplex lot access to the duplex's upper-level unit. On February 20, 2010, the Halvorsons made and the Bank accepted a written offer to purchase several lots of land, including the house lot but not the duplex lot. The offer stated on the first page that it was subject to "an easement to be placed approximately in existing driveway for access to adjacent house upper level." Handwritten next to the above quoted

sentence were the words "Exhibit C." Exhibit "C" was attached to the agreement and set forth the metes and bounds description of the centerline of the easement exactly as drafted by the surveyor.

The Bank listed the duplex lot for sale with a realtor. Allen and Dixie Bentley contacted another realtor, who was with the same realty agency as the Bank's realtor, to view the duplex lot, and they and their realtor viewed the property together. The Bentleys liked the property but were concerned about the parking situation for the upper-level unit of the duplex. The Bentleys' realtor expressed the Bentleys' concerns about the parking situation to the Bank's realtor, and the Bank's realtor clarified with Chad Curtain, a representative of the Bank, that an easement would be drawn up "to amend the problem." The Bank's realtor believed that "parking was involved in the negotiations," though it "did not end up being in the easement description." The Bank's realtor believed the purpose of the easement was for parking. Ultimately, the Bentleys decided to purchase the duplex lot and the closing occurred sometime around the beginning of July 2010. The warranty deed for the duplex lot was recorded on July 12, 2010, and it sets forth the metes and bounds description of the easement exactly as proposed by the surveyor. The easement's description lacks any explicit reference to "access," "parking," or purpose.

It appears the Halvorsons never had a formal closing. The Bank had quit-claimed some of the property the Halvorsons intended to purchase "to provide [them] basically with possession while the [Bank] continued its efforts to foreclose on the property." The Halvorsons received a warranty deed for the house, as well as other land they purchased from the Bank. The deed was signed by the

Bank's representatives July 14, 2010 and recorded July 19, 2010. The Halvorsons' warranty deed makes no reference to the easement.

After their purchase, the Bentleys used the Driveway as a driveway. They parked their vehicles at the end of the driveway near the walkway. At some point, the Halvorsons had the house torn down, creating more open area by the Driveway. Sometime thereafter, a neighbor contacted Roger and told him, "You better come up here. You got a parking lot up here." Roger went to investigate and found "there were four cars up there. There was the Bentleys' pickup, . . . and a car, and a couple other pickups. So there [were] a number of people parked . . . on the lots up there." And the battle began.

When the parties could not reach an agreement, the Bentleys contacted the surveyor and requested that he draw a plat of the easement based upon the metes and bounds set forth in their deed. The surveyor then platted the easement and lots. That platting is distilled into the following illustration:



## II. Proceedings.

In July 2011, the Halvorsons filed a petition "in equity" and "for declaratory judgment" against the Bentleys and the Bank. The Halvorsons requested the

district court declare "the nature and scope of the easement [was] limited to ingress and egress only and that it may not be used by the Bentleys for any other purpose," declare the "size and dimensions of the easement [were] limited to the narrowest possible [twelve]-foot strip of land," and find the Bank negligent and award the Halvorsons damages. The Bank admitted in its answer that its "understanding and intent with respect to the [Bentleys'] easement" was that the Bentleys could come and go across the easement but had no right to park there. The Bank denied it was negligent and affirmatively asserted it did not owe the Halvorsons any duty with respect to the Bentleys' easement "in that the Bentley transaction was fully consummated prior to the [Halvorsons'] acquisition" of the house lot that was subject to the easement.

The Bentleys answered and asserted counterclaims against the Halvorsons, including a claim that the Halvorsons intentionally damaged the Bentleys' property. The Bentleys also asserted cross-claims against the Bank for breach of warranty and breach of contract. The Bank answered the Bentleys' cross-claims and admitted "that no express limitation on the scope of the easement [was] set forth on the face of the deed," but it affirmatively stated "the real estate description for the easement [made] it clear that motor vehicle access [was] not included within its scope." The Bank denied that "there was a meeting of the minds between [the] Bentleys and the [Bank], through its employed real estate agent, that the easement would be used for travel over and across the servient estate, and for parking a vehicle thereon."

A bench trial was held in May 2014. At the trial's outset, the court noted it had before it "a blend of legal and equitable claims," and it advised the parties it

was "going to try this as if the whole [was] in equity," but that when evidence was offered to which there was an objection, each party should "state your objection" and "the basis for your objection so that it's in the record." The court stated it would admit the evidence subject to the objections and explained it would not consider irrelevant or inadmissible evidence with respect to each claim in making its decision.

At trial, Roger Halvorson admitted he read the legal description of the easement, but he testified he "just assumed that the easement was going to go closer to the property line rather than . . . meandering back through the other two lots." Roger did not know the prior owner/mortgagee had been parking in the Driveway; Roger testified he had "never visualized the driving and parking situation" and believed "[a]ccess was by foot traffic primarily." Curtain testified he told the Bank's realtor that he "believed there was going to be an easement," but he did not "have any specifics." The Bank's realtor testified she did not remember Curtain expressly using the word "parking," but she believed it was Curtain's understanding that the purpose of the easement was for parking, testifying "[t]hat was the purpose of the easement."

Following trial, the court entered its decree on March 3, 2015, finding the easement created by the Bank was for "access" only, meaning the right to ingress and egress and not for parking. The court noted that the Bentleys' deed does not define any purpose for the easement, and it relied upon the Halvorsons' purchase agreement which only references "access." The court found the easement was intended to be twelve feet wide. Additionally, the court found this

easement was what the Halvorsons bargained for, so the Bank was not negligent in this respect.

As to the Bentleys, the court found the easement set forth in their warranty deed was not accurate because the easement omits the "access" limitation language that is included in the Halvorsons' purchase agreement, which predated the Bentleys' deed. Since the Bank chose to include the easement's description in the warranty deed it gave to the Bentleys, the court found the Bank had a duty to defend the Bentleys in the Halvorsons' declaratory-judgment action concerning the easement, and it awarded the Bentleys attorney fees of $14,257.28. The court also found the Bank was liable "for the amount of consideration that [the Bentleys] paid for the easement described in their warranty deed rather than the easement that was created" in the purchase agreement between the Bank and the Halvorsons. The court found $7500 was "approximately what the Bentleys paid in the expectation that they would receive the easement described in their warranty deed rather than the more limited easement that they actually received." The court concluded the Bentleys did not prove any breach of contract separate from the warranty deed, and it entered a final judgment in favor of the Bentleys for $21,757.28 against the Bank. The court also denied the Bentleys' counterclaims against the Halvorsons.

### III. Post-Trial Proceedings.

On March 9, 2015, the Bank filed a motion pursuant to Iowa Rule of Civil Procedure 1.1007 requesting additional time to file post-trial motions. It stated it intended "to file one or more motions pursuant to [rule] 1.904 and/or 1.004 (sic)" and gave reasons it asserted were good cause for the extension. Neither the

Bentleys nor the Halvorsons filed a resistance, and the court on March 17, 2015, entered its order granting the motion, extending the deadline for post-trial motions for all parties to April 17, 2015.

On April 17, 2015, the Bank filed its rule 1.904(2) motion challenging the court's findings and conclusions.[2] Among other things, it argued the court erred in ignoring its evidentiary objections under the parol evidence rule and "in imposing a warranty of an easement upon the parties which the parties at the time of the [warranty deed] did not agree upon." The Bentleys filed their resistance to the motion on April 27, 2015, which asserted, among other things, that the Bank's motion was "a poorly written, hurried and confused scattergun-shot of supposed judicial errors, presenting no persuasive argument to change the basis for the [district court's] award of damages." The Halvorsons did not respond. On May 1, 2015, the court denied the Bank's motion.

The Bank filed its notice of appeal on May 20, 2015. The Bentleys filed their notice of appeal the next day. On its own motion, the Iowa Supreme Court determined the Bentleys' notice should be treated as a notice of cross-appeal. It subsequently transferred the case to this court in May 2016, and it was submitted following oral argument in November 2016.

### IV.  Scope and Standard of Review.

"Whether the district court tried a declaratory judgment proceeding in equity or at law is determinative of our scope of review on appeal." *Ernst v. Johnson Cty.*, 522 N.W.2d 599, 602 (Iowa 1994). Generally, "the determination

---

[2] The docket shows the Bank faxed a copy of its rule 1.904(2) motion to the Clayton County Clerk of Court on April 17, 2015, and another copy of the motion was received and file stamped on April 21, 2015.

of easement rights is equitable," *Gray v. Osborn*, 739 N.W.2d 855, 860 (Iowa 2007), prompting a de novo review, *see Ernst*, 522 N.W.2d at 602. However, "an action on contract is treated as one at law." *Van Sloun v. Agans Bros*., 778 N.W.2d 174, 178 (Iowa 2010). Additionally, "we review a decision by the district court to admit oral evidence of a contract under an exception to the statute of frauds for correction of errors at law." *Pavone v. Kirke*, 801 N.W.2d 477, 491 (Iowa 2011).

"If both legal relief and equitable relief are demanded, the action is ordinarily classified according to what appears to be its primary purpose or its controlling issue." *Van Sloun*, 778 N.W.2d at 179 (internal quotation marks and alterations omitted). If "an action at law and an action in equity are consolidated and tried in equity, our review of both matters is de novo." *In re Marriage of Tigges*, 758 N.W.2d 824, 826 (Iowa 2008) (citing *Knigge v. Dencker*, 72 N.W.2d 494, 495 (Iowa 1955)). "Where there is uncertainty about the nature of a case, a litmus test we use in making this determination is whether the trial court ruled on evidentiary objections. In addition, where the trial court labels its ruling a 'decree,' this is an indication it tried the matter in equity." *Ernst*, 522 N.W.2d at 602.

Here, the district court heard all evidence, subject to objections, but did not expressly rule upon the objections. Additionally, it issued a "Judgment and Decree" following trial. We believe the relevant factors considered together indicate the court tried this matter in equity, and our review is therefore de novo. *See id*. "This means that the district court's findings of fact are not binding, but we will 'give deference to those findings because the district court had the

opportunity to assess the credibility of the witnesses.'" *Horsfield Materials*, *Inc. v. City of Dyersville*, 834 N.W.2d 444, 452 (Iowa 2013) (citation omitted).

## V. Discussion.

The Bank appeals the district court's ruling finding it owed a duty to the Bentleys concerning the easement, asserting the court considered impermissible evidence in reaching that decision. The Bentleys cross-appeal, arguing the court erred in finding the easement does not include parking but correctly determined the Bank owed them a duty based upon their warranty deed. The Halvorsons responded to the Bank's appeal requesting the district court's ruling be affirmed in all respects. They also responded to the Bentleys' cross-appeal, asserting the Bentleys' appeal was untimely. Alternatively, they argued the court correctly found the easement was created for access only and not parking.

## A. Timeliness.

The Halvorsons concede the Bentleys filed "a timely notice of cross-appeal." However, because some of the issues the Bentleys raise on appeal were not raised by the Bank in its direct appeal and in its rule 1.904(2) motion, the Halvorsons assert the Bentleys were required to appeal their claims within thirty days of the district court's March 3, 2015 decree. Because the Bentleys' appeal was not filed within that time, the Halvorsons believe we must dismiss the Bentleys' appeal on those claims for lack of appellate jurisdiction. The Bank joins the Halvorsons' claim that the Bentleys' appeal was untimely, arguing the Bentleys' "*new issues* constitute a 'direct appeal' disguised as a 'cross appeal.'" In response, the Bentleys argue they had thirty days from the time the district court filed its ruling denying the Bank's rule 1.904(2) motion to file their notice.

"The timeliness of the filing of a notice of appeal is a jurisdictional question." *Homan v. Branstad*, ___ N.W.2d ___, ___ 2016 WL 6650114, at *2 (Iowa 2016). If the notice of appeal is not filed within the proper time period, appellate courts "do not have subject matter jurisdiction over the appeal." *McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 525 (Iowa 2015). Consequently, "[a]n appeal taken after the deadline must normally be dismissed." *Concerned Citizens of Se. Polk Sch. Dist. v. City Dev. Bd. of State*, 872 N.W.2d 399, 402 (Iowa 2015); *see also Explore Info. Servs. v. Court Info. Sys.*, 636 N.W.2d 50, 54 (Iowa 2001) (stating the "rule is mandatory and jurisdictional" and requires appellate courts "to dismiss a case not meeting these deadlines even if the parties do not raise the issue").

Iowa Rule of Appellate Procedure 6.101(1)(b) requires a notice of appeal be filed within thirty "days after the filing of the final order or judgment" *unless* a proper post-trial motion was "timely filed under [rule] 1.904(2) or [rule] 1.1007," in which case "the notice of appeal must be filed [thirty] days after the filing of the ruling on such motion." *See Homan*, ___ N.W.2d at ___. Rule 1.904(2) requires that a motion brought under it be filed "within the time allowed for a motion for a new trial." Rule 1.1007 provides that motions brought under rule 1.1004, which governs the requirements for filing a motion for a new trial, "be filed within fifteen days after filing of the verdict . . . unless the court, for good cause shown and not ex parte, grants an additional time not to exceed [thirty] days."

Here, the district court was permitted to extend the deadline for filing post-trial motions upon the Bank's rule 1.1007 motion for good cause, which was not challenged by the Halvorsons or the Bentleys. The court pushed out the

deadline for filing post-trial motions thirty days from the date it filed its order granting the motion, expressly extending the deadline for filing post-trial motions for all parties to April 17, 2015. Because the Bank filed its rule 1.904(2) motion on April 17, 2015, its motion was timely filed. *See also Blessum v. Howard Cty. Bd. of Sup'rs*, 295 N.W.2d 836, 840-41 (Iowa 1980) ("Because the order extending time to file post-trial motions was valid . . . under rule 247, defendant's post-trial motions filed thirty days after verdict were timely and notice of appeal therefrom was timely, giving us jurisdiction of this appeal.").

Yet, if its motion was not proper, the time to file its notice of appeal would not have been tolled.[3] *See Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 669 (Iowa 2013). A rule 1.904(2) motion is proper when it seeks "to obtain a ruling on an issue that the court may have overlooked, or to request the district court enlarge or amend its findings when it fails to comply with rule 1.904(1)." *Id.* It is not proper if it merely "amounts to nothing more than a rehash of legal issues previously raised." *Id.*

The Bank's rule 1.904(2) motion is not a model of clarity. Nevertheless, it highlighted at least one legal issue not explicitly addressed in the district court's decree—whether certain evidence was admissible considering the parol evidence rule, an issue it challenges on appeal. Consequently, we conclude that the Bank's rule 1.904(2) motion was proper and tolled the time for it to file its

---

[3] We note the Iowa Supreme Court recently adopted amendments to Iowa Rule of Civil Procedure 1.904, effective March 1, 2017, which eliminates the need to determine if the rule 1.904(2) motion was "proper." *See* Iowa Supreme Ct. Order, *Amendments to Iowa Rule of Civil Procedure 1.904 and Iowa Rule of Appellate Procedure 6.101* (Nov. 18, 2016) ("[N]ew provisions in [rule 1.904] allow that a timely rule 1.904(2) motion will extend the appeal deadline, subject to an exception for successive motions.").

appeal. *See, e.g.*, *Sierra Club Iowa Chapter v. Iowa Dep't of Transp.*, 832 N.W.2d 636, 642 (Iowa 2013) (finding rule 1.904(2) motion timely filed where legal issue raised was not addressed by district court); *In re Estate of Hord*, 836 N.W.2d 1, 5 (Iowa 2013) (same). Accordingly, the Bank's notice of appeal was timely filed.

Though neither the Bank nor the Halvorsons challenge the timeliness of the Bank's appeal, both argue the Bentleys' appeal was required to be filed within thirty days of the court's March 2015 decree, essentially because the Bentleys raised new issues in their cross-appeal. Both cite *Harvey v. Leonard*, 268 N.W.2d 504, 517 (Iowa 1978), in support of their argument. That case presented the following procedural posture:

> Defendants William C. and Eugene Daubendiek appealed from the judgment and decree of the trial court, and the original plaintiff Ruth Harvey cross-appealed as to all of the defendants[, including defendants F.W. Daubendiek and Letha Leonard]. F.W. Daubendiek and Letha Leonard have not appealed, and filed a motion to dismiss the cross-appeal against them, since it was not filed within [thirty] days after the final decree was entered and was not a cross-appeal as to them because they did not appeal.
> . . . .
> The final judgment in this case was entered on July 3, 1975. Defendants William C. and Eugene Daubendiek filed timely notice of appeal on August 4, 1975, in accordance with [the Iowa Rules of Civil Procedure].

*Harvey*, 268 N.W.2d at 511, 517. At that time, the rules stated "that a party may appeal within [thirty] days of a final judgment and may cross-appeal within the same [thirty]-day period or within five days of an appeal." *Id.* at 517 (discussing the rule, then numbered 335). The court stated Harvey filed a notice of cross-appeal on August 7, 1975, "which was within the time for a cross-appeal but not for a direct appeal." *Id.* Because "Leonard and F.W. Daubendiek did not

appeal," the court held Harvey's "cross-appeal against them was not timely under [the rule]" and granted the motion to dismiss. *Id.*

Though *Harvey* has not been expressly overruled on this point, we think later cases demonstrate *Harvey* is no longer good law for this proposition. In *State ex rel. Iowa Department of Transportation v. General Electric Credit Corp.*, 448 N.W.2d 335 (Iowa 1989) ("*General Electric*"), the Iowa Supreme Court was presented with the following scenario:

> The Iowa Department of Transportation (IDOT) filed an action against three separate corporate entities regarding their failure to register and pay statutorily-required fees for the operation of an aircraft within the state. The district court granted summary judgment in favor of the IDOT against two of the defendants, Heritage and G.E. Delaware, but refused to pierce the corporate veil and granted summary judgment in favor of the third defendant, G.E. Capital.
>    Heritage and G.E. Delaware filed a notice of appeal on the twenty-ninth day after the district court's judgment. IDOT filed a notice of cross-appeal more than thirty days after the district court judgment, seeking to appeal from that portion of the district court's ruling which granted summary judgment on behalf of G.E. Capital. G.E. Capital sought to dismiss the cross-appeal as untimely, claiming that because G.E. Capital was not a party to the original appeal, the filing of the IDOT was not a cross-appeal but in fact should be treated as an original appeal.

*Stew-Mc Dev., Inc. v. Fischer*, 770 N.W.2d 839, 845 (Iowa 2009) (citations omitted) (summarizing *Gen. Elec.*, 448 N.W.2d at 338-40). The IDOT argued the relevant rule "specif[ying] the time within which a cross-appeal may be taken," then Iowa Rule of Appellate Procedure 5(a), permitted "a cross-appeal against any party to the judgment appealed from, whether appellant or non-appellant." *Gen. Elec.*, 448 N.W.2d at 338 (citation omitted).

Ultimately, the court agreed with the IDOT without mentioning *Harvey*, only stating it found "no Iowa case on point." *See id.* 338-40. Instead, the court

noted the rule did not define the term "cross-appeal," "designate the parties against whom a cross-appeal may be filed," or "extend or restrict the right of cross-appeal to any particular litigants." *Id.* at 338-39. Rather, the rule "merely direct[ed] that a cross-appeal—an undefined term—must be taken within the specified time." *Id.* at 339. Finding the rule ambiguous on the point, and construing the rule "liberally so that [the controversy could] be fairly and efficiently determined," the court reasoned:

> Allowing cross-appeals of this type would streamline the appellate process by making "precautionary appeals" by a party that prevailed at the trial level against some, but not all, adverse parties unnecessary. The risk of any party suffering injustice because of a last-minute appeal would be minimized, because a party's stake in the litigation could still be protected by cross-appeal if portions of the judgment favorable to it are put in jeopardy by appeal.
>
> In this case, for example, the [IDOT] may well have chosen not to appeal the judgment in favor of G.E. Capital only because it believed that the judgment against Heritage and G.E. Delaware was surely collectible. That judgment was finally appealed one day before the time limit for appeal expired. Were we to adopt the defendants' construction of [the rule], the [IDOT] would have been left with only one day to appeal the portions of the judgment adverse to it so as to protect its rights in the event the portions of the judgment favorable to it were reversed on appeal. We refuse to place such a high premium on the gamesmanship likely to occur under such a rule.
>
> Moreover, litigants in the position of G.E. Capital in this case would not be unfairly burdened by allowing cross-appeals of this type against them under the Iowa rules. After all, [the rule] allows a cross-appeal only if it is filed—at the very latest—no more than five days beyond the thirty day time limit for an initial appeal. The advantages of our court considering a judgment in its entirety outweigh any inconvenience suffered by non-appellants who, like G.E. Capital, are joined in the fray by cross-appeal within the short time allowed for cross-appeals under the Iowa rules.
>
> We hold that for purposes of appeal under Iowa Rule of Appellate Procedure 5, an action involving multiple parties will be considered to result in a single judgment, so that where one of the several parties to the action appeals and jeopardizes any part of the judgment, a party may cross-appeal against any other party to

the litigation within the time allotted for cross-appeals. The [IDOT's] cross-appeal, therefore, is properly before the court.

*Id.* at 339-40 (citations omitted).

The court revisited *General Electric* in *Stew-Mc Development*, where a similar claim was raised:

> Stew-Mc Development asserts that the Fischers seek to appeal issues separate and apart from the issues appealed by the Schmitts and that, as a result, their action should properly be classified as an appeal, not a cross-appeal. If the Fischers' filing is characterized as an appeal it is untimely because it was not filed within thirty days of the final judgment. If classified as a cross-appeal, however, it complies with the rule because it was filed within five days of the Schmitts' appeal.

770 N.W.2d at 845. Stew-Mc Development argued *General Electric* was distinguishable because, in *General Electric,* "the party bringing the cross-appeal was a litigant with respect to the claims challenged in the original appeal." *Id.* at 846. Unlike the cross-appellant in *General Electric*, "the Fischers [were] attempting to file a cross-appeal against a party that was not part of the original appeal." *Id.* at 846. Stew-Mc Development also argued the Fischers' claim in their cross-appeal was "factually and procedurally independent of the claims appealed in the Schmitt's original appeal." *Id.* The Iowa Supreme Court was not persuaded, quoting its holding in *General Electric* and finding "no reason to depart from this holding now." *Id.* Again, without any reference to *Harvey*, the court found the Fischers' cross-appeal was timely filed. *See id.*

The rules now provide "any notice of cross-appeal must be filed within the [thirty]-day limit for filing a notice of appeal, or within [ten] days after the filing of a notice of appeal, whichever is later." Iowa R. App. P. 6.101(2). Here, the district court's ruling on the Bank's 1.904(2) motion was filed May 1, 2015. The Bank

filed its timely notice of appeal on May 20, 2015. Irrespective of the issues raised by the Bentleys or the parties they appeal against, *General Electric* and *Stew-Mc Development* establish that once the Bank timely filed its notice of appeal, the Bentleys had ten days thereafter to file their own notice of appeal. The reasoning of those cases make sense; perhaps the Bentleys would have stood upon the judgment entered in their favor against the Bank had the Bank not appealed. But once the Bank appealed and required them to defend the appeal, there was no harm in filing their own appeal.

The Bentleys filed their notice of appeal on May 21, 2015, one day after the Bank filed its notice. Thus, the Bentleys' notice of appeal was timely filed. *See also Blessum*, 295 N.W.2d at 841 ("Because defendants' appeal was timely, plaintiff may cross-appeal in accordance with [the rules]. Plaintiff properly filed his notice of cross-appeal within five days after the appeal. The cross-appeal also was taken from the trial court's final judgment on count V, as well as from the denial of his post-trial motions. Because the cross-appeal was properly taken from the final judgment on count V, we find that we also have jurisdiction to entertain plaintiff's cross-appeal.").

### B. Evidentiary Issues.

We turn to the Bank's evidentiary claims concerning the statute of frauds and parol evidence rule. Application of these rules must be discussed in context, given the Bentleys' challenge of the district court's determination the easement is for ingress and egress only, not parking.

### 1. *Statute of Frauds.*

> [A]n easement is a liberty, privilege, or advantage in land without profit existing distinct from ownership of the soil and because it is a permanent interest in another's land with the right to enter at all times and enjoy it, it must be founded upon a grant by writing or prescription.

*Indep. Sch. Dist. of Ionia v. De Wilde*, 53 N.W.2d 256, 261 (Iowa 1952). Because an express easement must be founded upon a grant by writing, it falls within the statute of frauds. *See Gray*, 739 N.W.2d at 861 (citing Iowa Code § 622.32 (2007)). "The statute of frauds, which is no more than a rule of evidence, 'governs, not the validity of a contract, but only the manner in which one may be proven.'" *Garland v. Branstad*, 648 N.W.2d 65, 71 (Iowa 2002) (citation omitted). Iowa's statute of frauds provides:

> Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by the party's authorized agent:
> . . . .
> 3. Those for the creation or transfer of any interest in lands, except leases for a term not exceeding one year. . . .

Iowa Code § 622.32 (2010). "The Iowa statute of frauds does not render oral promises invalid. Rather, the statute is a rule of evidence that renders incompetent oral proof of such promises." *Pavone*, 801 N.W.2d at 491.

Here, the written warranty deed between the Bank and the Bentleys contains an easement that is legally described. The Bank does not dispute there is an easement. Clearly the statute of frauds has been satisfied here, and the Bank's argument concerning the statute of frauds is without merit.

### 2. Parol Evidence.

"In the construction of written contracts, the cardinal principle is that the intention of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says. This rule is applicable to construction of easement grants." *Wiegmann v. Baier*, 203 N.W.2d 204, 208 (Iowa 1972) (internal citation omitted). "Ambiguity exists if, 'after the application of pertinent rules of interpretation to the face of the instrument, a genuine uncertainty results as to which one of two or more meanings is the proper one.'" *Cairns v. Grinnell Mut. Reins. Co.*, 398 N.W.2d 821, 824 (Iowa 1987) (citation omitted). "The parol evidence rule is not violated when extrinsic evidence is received to assist the trial court in determining the meaning of contractual language. The rule does not come into play until by interpretation the meaning of the writing is ascertained." *Westway Trading Corp. v. River Terminal Corp.*, 314 N.W.2d 398, 402 (Iowa 1982) (citations omitted).

Here, we essentially have three contracts at issue—the two warranty deeds given by the Bank and the purchase agreement between the Bank and the Halvorsons. Each describes the easement in different terms, and there is uncertainty as to which meaning controls. Because of the ambiguity between the three contracts, we conclude the court's admission and use of parol evidence was permissible. We find no error by the district court in this respect.

### C. Interpretation.

The district court found the easement "was created in the Offer to Buy Real Estate and Acceptance that Halvorson and [the Bank] signed on February 20, 2010." Though the purchase agreement came first in time, we do not agree

that its reference to the creation of an easement determines the meaning of the easement set out in the Bentleys' deed. First, "an instrument affecting real estate is of no validity against subsequent purchasers for a valuable consideration, without notice . . . unless the instrument is filed and recorded in the county in which the real estate is located, as provided in [chapter 558]." Iowa Code § 558.41(1). However:

> Existing rights in property may exist apart from filings in the recorder's office:
>> Absent express notice given, a land purchaser generally has three established sources of information to which he should turn for ascertainment of existing rights in any property he proposes to buy: (1) the records in the County Recorder's office where basic rights involved are recorded; (2) other public records, to discover existence of rights not always disclosed in the County Recorder's office, i.e., judgments, liens and taxes; and (3) an inspection of the land itself, to determine by observation any rights which may exist apart from our recording system by virtue of occupancy, use or otherwise.

*Nat'l Props. Corp. v. Polk Cty.*, 351 N.W.2d 509, 511 (Iowa 1984) (quoting *Bartels v. Hennessey Bros., Inc.*, 164 N.W.2d 87, 94 (Iowa 1969)). Thus "notice," as referred to in section 558.41(1), may be either actual or constructive. *Id.* "Constructive notice is given by compliance with the recording statutes," whereas "[a]ctual notice depends upon the purchaser having either actual knowledge of the easement or knowledge of sufficient facts to charge him or her with a duty to make inquiry that would reveal the existence of the easement." *Id.* If a prudent person had inquired with ordinary diligence and found actual notice of rights claimed adversely by another, the land purchaser is charged with having that notice. *See id.*; *see also* 25 Am. Jur. 2d *Easements and Licenses* § 81 (2016).

The Bank, as owner and seller of both lots, had the right to grant future owners of the duplex lot an express easement over the house lot. *See* 25 Am. Jur. 2d *Easements and Licenses* § 12. Though its purchase agreement with the Halvorsons occurred first in time, the purchase agreement was not recorded. Moreover, the Bentleys' inspection of the land revealed that the mortgagee was using the Driveway and parking his vehicles near the walkway. This led them to inquire what rights they would have over the house lot if they purchased the duplex lot, and they were never told by the Bank their rights would be limited to "access" only nor were they given a copy of the purchase agreement between the Bank and the Halvorsons. Consequently, though that purchase agreement came first in time, it does not change the easement created by the Bank in the warranty deed it gave to the Bentleys.

There is no dispute that the Bentleys' deed with the express easement was properly recorded before the official sale to the Halvorsons took place. It was the Halvorsons responsibility to investigate—or perhaps the Bank's burden to inform the Halvorsons of—the existence and scope of the easement and determine what rights it afforded the duplex-lot owners before they purchased the property. Had they reviewed the Bentleys' recorded deed, or even asked the Bank about the easement Roger knew the Bank was creating, they would have had notice the easement was established by the Bank on the house lot without any limitation or express purpose. For these reasons, we conclude the Bentleys' deed, given by the Bank, created the easement and controls the outcome.

The Bentleys' deed states there is an easement and gives the metes and bounds of the easement. However, besides the obvious omission of the word

"foot," the Bentleys' deed does not state any purpose for the easement. It does not even contain the word "access." Does that mean the easement is ambiguous? We think not.

> Where the existence of an easement is in general terms, it implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner. The holder of an easement may make the way as useable as possible for the purpose of the right owned so long as he or she does not increase the burden on the servient tenement or unreasonably interfere with the rights of the owner thereof. A court's easement overburdening analysis will evaluate whether it is reasonable to conclude that a particular use was within the contemplation of the parties to the conveyance and, in that context, whether the contested use made of the servient estate by the dominant estate exceeds the rights granted to the user.

*Id.* § 62 (footnotes omitted); *see also* Jon W. Bruce & James W. Ely, Jr., *The Law of Easements & Licenses in Land* § 8:3 (2016) ("Despite the professed emphasis on the binding effect of precise language, the parties are deemed to have contemplated the easement holder's right to do whatever is reasonably convenient or necessary in order to enjoy fully the purposes for which the easement was granted. What constitutes reasonable usage is a question of fact." (footnotes omitted)).

> And it is the general rule that where a right of way is granted it may be used for any purpose to which the land accommodated thereby may reasonably be devoted, unless the grant contains specific limitations and the grantee can avail himself of modern inventions, if by so doing he can more fully exercise and enjoy or carry out the object for which the easement was granted.

*Wiegmann*, 203 N.W.2d at 208. Given the general terms of the easement, we think a grant of unlimited reasonable use as is necessary and convenient was intended, which included parking.

We would also reach the same result if we found the language to be ambiguous. As noted above, "the intention of the parties is of paramount importance." *Gray*, 739 N.W.2d at 861 (citing Restatement (Third) of Property: Intent to Create a Servitude § 2.2 cmt. d (Am. Law Inst. 2000)).

> When the purpose of an express easement is not clear, a court must ascertain the objectively manifested intention of the parties to the original conveyance in light of the circumstances in existence at the time the easement was made, as well as the physical condition of the premises, and the use of the easement and acts acquiesced to during the years shortly after the original grant.

25 Am. Jur. 2d *Easements and Licenses* § 63 (footnotes omitted). Furthermore, "a grant or reservation of an easement will ordinarily be construed in favor of the grantee." *Id.* § 17.

Here, the Bank included the easement in the warranty deed it delivered to the Bentleys before it finalized the sale of the house lot to the Halvorsons. The Bank could have limited the scope of the easement in the Bentleys' deed, but it did not. The Bentleys were left in the dark as to any pre-existing agreement between the Bank and the Halvorsons. Moreover, what became the easement was a driveway used for parking before the Bank sold either lot of land. The Driveway is not an alleyway or through street; it leads directly to a walkway to the duplex's upper unit's front door. At the time of the sale, that was the *only* way to access the upper-level unit. To presume it would be used to drop a person off (and whatever goods they may have to take in), and then require the driver to drive back down and park, then walk back up the easement to go into the upper-level unit makes no sense. The mortgagee's historical use of the Driveway as a driveway with parking was evident before the Bank sold the lots. Considering the

parties' intent, along with the realtors' testimony, the odd and steep location of the Driveway and its prior use, and construing any ambiguities against the Bank, a reasonable person in the Bentleys' position would believe the easement's purpose includes not only ingress and egress to the upper unit of the duplex but also parking.  We reverse the district court on this issue.

### D.  Remaining Issues.

### 1.  Bentleys' Appellate Claim for "Turnabout."

For the first time on appeal, the Bentleys argue the width of the easement should be expanded to allow them to turn around at the south end of the Driveway.  However, they conceded at oral argument that this claim was not raised before or decided by the district court.  "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."  *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).  We therefore conclude error was not preserved on this claim.

### 2.  Bentleys' Judgment Against the Bank.

Because we conclude the easement established by the Bank in the Bentleys' warranty deed is not limited to mere access but includes parking, we reverse and vacate the district court's award of $7500 to the Bentleys for the cost of the easement it found they were sold but did not receive.  However, we also must address the district court's award of trial attorney fees.

Attorney fees are generally not allowable in the absence of statute or an agreement by the party to be charged.  *See Van Sloun*, 778 N.W.2d at 182.  But, the Iowa Supreme Court "has long allowed the recovery of attorney fees incurred

in defending title as an element of damages for breach of the covenant of title."
*Gaede v. Stansberry*, 779 N.W.2d 746, 749 (Iowa 2010). A covenant of warranty, the principal covenant found in most deeds, constitutes an agreement by the grantor that upon the failure of the title which the deed purports to convey, either for the whole estate or part only, the grantor will pay compensation for the resulting loss. *See Kendall v. Lowther*, 356 N.W.2d 181, 189-90 (Iowa 1984). Here, the warranty deed given to the Bentleys by the Bank stated the Bank "covenants to Warrant and Defend the real estate against the lawful claims of all persons . . . ."

Generally:

> A party is entitled to recover of the covenantor all reasonable costs attending a litigation of the question of title. Thus, when the covenantee in good faith defends the title, recovery of the taxable costs and expenses paid by him or her in that action is allowed. In fact, in an action for breach of covenant of warranty, the covenantee may recover for the damages and costs and expenses of suits brought against him or her, but also for the costs and expenses of suits brought by him or her, affecting the title to the estate; this is so because each suit may have been part of the means by which the title was sought to be defended. In some jurisdictions, in an action against the covenantor for breach of covenant, only the taxable costs incurred by the covenantee in defending the title may be recovered.

20 Am. Jur. 2d *Covenants, Etc.* § 139 (footnotes omitted). However, "before a covenantee may recover the expenses attending the defense of the title to the property, the covenantor must be given notice of the proceeding in which the validity of the title is attacked and have failed to or chosen not to defend." *Gaede*, 779 N.W.2d at 750 (citation omitted).

Here, the Halvorsons filed suit against the Bentleys concerning the easement, and the Bentleys requested the Bank defend them in the suit pursuant

to the warranty deed. The Bank refused. Given the Bank's warranty to the Bentleys, its refusal to defend them, and its contrary position in the underlying suit against them, we conclude that the district court's award of trial attorney fees to the Bentleys was proper. Accordingly, we affirm that award of $14,257.28 for trial attorney fees and costs.

### 3. Bentleys' Request for Appellate Attorney Fees.

Finally, we address the Bentleys' request for appellate attorney fees. "Generally, attorney fees are not allowable unless authorized by statute or contractual agreement." *FNBC Iowa, Inc. v. Jennessey Grp., L.L.C.*, 759 N.W.2d 808, 810 (Iowa Ct. App. 2008) (citing *W.P. Barber Lumber Co. v. Celania*, 674 N.W.2d 62, 66 (Iowa 2003)). However, courts are authorized "to award attorney fees in an action where 'judgment is recovered upon a written contract containing an agreement to pay an attorney's fee.'" *Id.* (quoting Iowa Code § 625.22). Given the terms of the Bentleys' warranty deed issued by the Bank and the circumstances of the case, the Bentleys are entitled to reasonable appellate attorney fees.

### VI. Conclusion.

The Bentleys' appeal was timely filed. They also proved the easement established by the Bank on the house lot is not merely for access, i.e. ingress and egress, but also includes parking for the upper unit of the duplex. We reverse the district court on this issue. We deny the claims raised by the Bank on appeal.

In light of our conclusion, we vacate the district court's award of damages to the Bentleys. We affirm the award of trial attorney fees and costs to the

Bentleys.  Additionally, we find the Bentleys are entitled to reasonable appellate attorney fees and costs.  Accordingly, we remand to the district court to enter judgment consistent with this opinion and to determine the reasonable amount of appellate attorney fees and costs to be awarded to the Bentleys.

Costs are taxed to the Bank.

**JUDGMENT VACATED IN PART, AFFIRMED IN PART, AND REMANDED WITH DIRECTIONS.**